**UNITED STATES of America**

v.

**Hugh B. HALLIMAN, et al. Appellants.**

**Nos. 89–3182, 89–3183.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 21, 1990.

Decided Jan. 15, 1991.

R. Kenneth Mundy, Washington, D.C., for appellant Hugh B. Halliman in No. 89–3182.

Lawrence M. Baskir (appointed by the court), for appellant Troy Phauls in No. 89–3183.

Sherri L. Evans, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and Patricia Stewart, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee in both cases.

Before RUTH BADER GINSBURG, SENTELLE, and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge THOMAS.

CLARENCE THOMAS, Circuit Judge.

Hugh Halliman and Troy Phauls appeal their convictions for possessing cocaine and cocaine base (crack) with intent to distrib- ute. Each contends that the district court improperly denied his respective motion to suppress tangible evidence. Phauls also contends that the court erred in denying his motions to sever his trial from Halli- man's. We affirm both convictions.

## I. FACTS

In November 1988, Michael Haynie, the night manager of the Holiday Inn at 1501 Rhode Island Avenue, N.W., in Washing- ton, D.C., called the Metropolitan Police Department about a group of guests who had resided at the hotel since late that October. The guests rented two or three rooms at a time, received fifteen to twenty calls per day, paid for their rooms in cash, and switched rooms frequently. A hotel housekeeper had found drugs, drug para- phernalia, and ammunition in one of the guests' rooms.

Officer Wayne Simpson and Detective Robert Thompson led the police depart- ment's investigation. Beginning on No- vember 29, they interviewed Haynie and other security personnel at the hotel. Hay- nie gave the officers the name and address of Hugh Halliman and descriptions that fit Troy Phauls and Kenneth Shannon. On one occasion, Haynie pointed Phauls out to Simpson in the lobby as the taller of the two men he had described. Hotel security guards also gave the officers the names and addresses of two women, Lisa Holland and Sharon Daniels, who the guards be- lieved were associated with the group.

Simpson and Thompson gathered addi- tional evidence that the group of guests was involved in drug trafficking. On the evening of November 29, they learned that the group had switched to room 903 from rooms 601 and 602. Simpson and Thomp- son searched the abandoned rooms and found cocaine residue, marijuana, and a round of ammunition. On December 5, they learned that the hotel's cleaning staff had seen handguns in room 903, which members of the group continued to occupy.

On the same day, December 5, the offi- cers learned that Halliman had paid for two additional rooms, numbers 806 and 918, one of which was registered in Lisa Holland's

name. They decided to seek warrants for the three rooms that they could link to Halliman. The next day, at about 5:00 p.m., Detective Thompson applied to the D.C. Superior Court for search warrants. The affidavits supporting Thompson's application identified Hugh Halliman, Lisa Holland, and Sharon Daniels by name and stated that since late October, Halliman had rented eleven different rooms, Holland had rented two rooms, and Daniels had rented one. The affidavits did not refer to either Phauls or Shannon. The judge issued all three warrants.

When Thompson returned to the police station with the warrants, the officers who were to participate in the room searches assembled for a briefing and discussed the rooms and individuals that the search warrants targeted. The officers also learned that two men, in addition to Halliman, were connected to the group.

Shortly before the police left the station, Haynie called Simpson, who had called earlier seeking to confirm the suspects' room numbers, and told him that Halliman had just rented room 900. The officers did not delay their search to apply for a warrant for the new room. Instead, they decided to execute their warrants for rooms 806, 903, and 918 and to knock on the door of room 900 and attempt to interview and identify the occupant.

## A. *Search of Room 900*

The police officers arrived at the Holiday Inn at about 7:00 p.m., met Haynie in the basement to get keys to rooms 806, 903, and 918, then rode the elevators to the eighth and ninth floors. On the ninth floor, Sergeant Gerald Neill and two other officers positioned themselves in front of room 900. Neill, armed with a shotgun but not with a key, stood in front, approximately three inches from the door. He knocked on the door, waited, then knocked again. A man with a heavy Jamaican accent said "just a minute, just a minute." Neill had met Halliman before on at least one occasion and knew that he spoke with a heavy Jamaican accent. Meanwhile, to Neill's surprise, the officers down the hall began

knocking on the doors to rooms 903 and 918 and loudly announcing their presence. The man inside room 900 again said "just a minute, just a minute"; he sounded as if he were moving across the room. Then Sergeant Neill heard what he thought was the sound of a flushing toilet. Fearing that the man inside was destroying narcotics, Neill and the other officers started kicking and banging at the door. Moments later, more officers came up the hall from room 806 with a sledgehammer and broke the door down.

When the policemen rushed through the doorway, they saw Halliman running out of the bathroom. They collided with him, pushing him back into the bathroom, where the water in the toilet bowl was still swirling. In plain view on the bathroom floor was a plastic bag containing cocaine.

The policemen forced Halliman to lie face down on the floor in front of the bathroom door. Neill knelt down to Halliman, who was naked, and said, "You know who we are. You know why [we] are here. We are the police." He then asked, "Do we have your permission to search your apartment, yes or no?" Halliman answered "yes." The officers began to search room 900 and found some cocaine and crack inside a shoe in a shoe box and in a clothes bag in the coat-rack area. At that point, Neill asked Halliman, who had since gotten dressed, to sign a consent-to-search form, which Neill had obtained from his briefcase. Halliman refused. The police officers terminated their search and took Halliman from the room.

Neill left the hotel to apply for an emergency search warrant. His affidavit included copies of the search warrants and affidavits for rooms 903, 918, and 806, explained why the police had forcibly entered room 900, and further stated:

Once inside Mr. Halliman was stopped comeing [sic] our [sic] of the bathroom, and found on the floor was a plastic bag containing off white powder (Cocaine). The affiant then ask [sic] Mr. Halliman if the officers could have permission to search his apartment. Mr. Halliman gave that permission. The affiant then

obtained a consent to search form while other officers began to search. Mr. Halliman then refused to sign a consent to search and the search was stopped, but not before the officers had recovered an additional quantity of powder and crack cocaine. Field test positive for Cocaine. The tests were from both the powder and the crack cocaine.

The judge granted the warrant, and the officers resumed their search of room 900, finding Halliman's wallet with some currency, a beeper, and personal papers.[1]

## B.  *Search of Phauls's Person*

While Sergeant Neill was away seeking the emergency search warrant, Phauls and Shannon entered the hotel lobby. Detective Pierre Mitchell, who was present in the lobby, saw the two men enter and head toward the elevators. As they walked by, a security guard told Mitchell that Phauls and Shannon "were two of the men that were frequenting the [ninth] floor." Mitchell decided to follow them.

Phauls and Shannon took the elevator to the ninth floor. As they left the elevator, they walked by Officer William Nealis and Haynie, the night manager, who were standing in the hallway outside room 900. Nealis watched the two men look intently at the broken lock on room 900 and walk down the hallway toward room 903. Haynie then advised Nealis that the two men were "the other two guys in the group" and that the taller one was armed. Phauls and Shannon continued toward room 903, stopped briefly in front of the door, and then turned toward room 908, which was directly across the hall. As the two men took a few steps away from room 908, Nealis approached them with a gun in his hand, and told them to put their hands against the wall. Nealis patted Phauls down and took seventeen plastic bags containing crack from Phauls's left sleeve.

Detective Mitchell subsequently joined Nealis, patted down Shannon, and recovered keys to room 903 and to a padlock found there.

## C.  *The Indictment and Pre–Trial Motions Hearing*

On January 5, 1989, the government filed a three-count indictment in the district court against Halliman, Phauls, and Shannon. The first count charged Halliman and Shannon with possession with intent to distribute more than fifty grams of crack. *See* 18 U.S.C. § 2; 21 U.S.C. § 841(a), (b)(1)(A)(iii). The second count charged Phauls with possession with intent to distribute more than five grams of crack. *See* 21 U.S.C. § 841(a), (b)(1)(B)(iii). The third count charged Halliman with possession with intent to distribute a detectable amount of cocaine. *See* 18 U.S.C. § 2; 21 U.S.C. § 841(a), (b)(1)(C).[2] Shannon pleaded guilty before trial.

Halliman and Phauls both filed pre-trial motions to suppress tangible items of evidence. Halliman moved to suppress three categories of evidence that the police had recovered from room 900: the bag of cocaine that the officers had found on the bathroom floor after entering the room; the bags of cocaine and crack that the officers had found after Halliman said that they could search the room; and the remaining evidence, including Halliman's wallet, some personal papers, and an electronic beeper, which the officers had found after resuming their search pursuant to the emergency search warrant. Phauls moved to suppress the seventeen bags of crack that the police had discovered on his arm. He also moved to sever his trial from Halliman's on the ground that joinder of the two defendants and the three offenses was improper under rule 8 of the Federal Rules of

---

1.  The police also recovered evidence from room 903: $1,440 in cash, two brown paper bags containing large amounts of cocaine, empty bags and razor blades with residue, mail with Halliman's name, a small padlock and assorted jewelry. The police did not, however, find any evidence of the group's drug-trafficking activities in rooms 918 or 806.

2.  The sources of the drugs in the indictment break down as follows: the first count, which named both Halliman and Shannon, referred to the crack found in both rooms 900 and 903; the second count, which named only Phauls, referred to the crack found on Phauls's person; and the third count, which named only Halliman, referred to the cocaine found in room 900.

Criminal Procedure. After holding a hearing, the district court denied all three motions. *See United States v. Halliman*, Crim. No. 89–00003–TFH, mem. op. at 2 (D.D.C. May 11, 1989). A jury subsequently found Halliman and Phauls guilty on all the counts.

## II. DISCUSSION

### A. *Hugh Halliman*

We begin with Halliman's appeal. The district court refused to suppress any of the evidence recovered from room 900. First, the court held that the police officers' initial, warrantless entry into room 900 did not violate the Fourth Amendment because it was justified by exigent circumstances. *See Halliman*, Crim. No. 89–00003–TFH, mem. op. at 8–13. "Since the police lawfully entered the apartment and proceeded to the bathroom," the court reasoned further, "they were permitted to seize [the] incriminating evidence in plain view" on the bathroom floor. *Id.* at 13. Next, the court held that although Halliman's verbal consent to search the remainder of the room was involuntary, the subsequent, emergency search warrant cured any legal defects in the consent. *See id.* at 13–16. Thus, the court concluded, "the evidence found in the coat rack area, as well as the evidence seized pursuant to the emergency warrant, is admissible under the so-called 'independent source' doctrine." *Id.* at 16. We agree with the court's conclusions.

#### 1. Exigent Circumstances

■■ The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless entry into a hotel room is " '*per se* unreasonable in the absence of some one of a number of well defined "exigent circumstances." ' " *United States v. Timberlake*, 896 F.2d 592, 596 (D.C.Cir.1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 478, 91 S.Ct. 2022, 2044, 29 L.Ed.2d 564 (1971)). Exigent circumstances exist where "evidence ... may be lost or destroyed if a search is delayed." *United States v. Johnson*, 802 F.2d 1459, 1462 (D.C.Cir.1986).

Police officers relying on this exception to the warrant requirement must have probable cause to search a room, *United States v. Socey*, 846 F.2d 1439, 1444 n. 5 (D.C. Cir.), *cert. denied*, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988), and "an objectively reasonable basis for concluding that the destruction of evidence is imminent," *id.* at 1445.

The district court held that each of these requirements was met, and Halliman does not challenge these conclusions. Instead, Halliman contends that the police unlawfully entered room 900 because they unreasonably failed to obtain a warrant after Haynie called the station and then deliberately manufactured the exigent circumstances on which they relied to justify their entry. We reject Halliman's contentions.

■ Halliman argues that the police created the exigent circumstances in room 900 by knocking on the doors to rooms 903 and 918 and loudly announcing their presence while Sergeant Neill was attempting to "interview" the occupant of room 900. *See, e.g., Timberlake*, 896 F.2d at 596–97. Police officers may not create an emergency and then use it to justify an emergency search. *Socey*, 846 F.2d at 1448. The district court, however, found that the police "did not plan to enter and search room 900 without a warrant," *Halliman*, Crim. No. 89–00003–TFH, mem. op. at 11, and therefore did not "carr[y] out a deliberate plan to create exigency," *id.* at 12. Because "the district court's account of the evidence is plausible in light of the record viewed in its entirety," its finding is not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The timing of the police officers' "knock and announce" routines might seem suspicious in light of their failure to seek a warrant for room 900. But Sergeant Neill testified that the police did not discuss in advance the "knock and announce" routine for each room and that he was startled when the officers outside room 903 began to execute their warrants. Crediting testimony that Haynie had called the police about room 900 shortly before they left the

station, the district court did not find Neill's explanation implausible. Moreover, before he entered room 900, Neill did not identify himself as a policeman. *Cf. Timberlake,* 896 F.2d at 597 (police improperly manufactured exigency when they knocked on door and shouted "police, police, open up"). Nor did he obtain a passkey to the room. Neill tried to enter room 900 only after he heard what he suspected was evidence flushing away. The district court's decision to credit Neill's testimony was well within its discretion as fact-finder.

■ The district court also concluded properly that the police officers' failure to obtain a warrant for room 900 prior to leaving the station did not disqualify them from entering the room once exigent circumstances arose. We recognize, as did the district court, that the police officers had probable cause to search room 900 immediately after Haynie called Simpson at the station. *See Halliman,* Crim. No. 89–00003–TFH, mem. op. at 9 (holding that probable cause existed on grounds that "[t]he information in the affidavit supporting the warrants for rooms 903, 918, and 806 would also have justified a warrant for room 900" and that "the police had fresh information from [Haynie] that the suspects were using the room"). We also recognize that the police reasonably could have postponed the search of all the hotel rooms while they sought a warrant for room 900. *See id.* at 11. Nothing in the record suggests that the police conducted their search early that evening because they feared that Halliman might leave the hotel or remove evidence. Nor does anything suggest that the police would have had to delay their search for a long time had they applied for a warrant.[3] But the

failure promptly to seek a warrant does not automatically disqualify the police from relying on exigent circumstances. The time available to seek a warrant is only one factor contributing to our determination whether the officers' conduct was reasonable. *See, e.g., United States v. Allison,* 639 F.2d 792, 794 (D.C.Cir.1980) ("The night time hours and the difficulty of obtaining a search warrant at that time are also factors that add to the reasonableness of the decision to proceed without a search warrant.").

In *United States v. McEachin,* 670 F.2d 1139 (D.C.Cir.1981), we held that a police officer's decision not to apply for a warrant earlier in his investigation did not disqualify him from performing a warrantless search later when exigent circumstances arose. We explained:

[W]e cannot say on the basis of the record before us, that Officer Oldham's investigation lacked diligence or reasonableness. Nor can we say that his decision not to seek a warrant earlier in his investigation was improper or unreasonable under the circumstances. The wisdom *vel non* of Officer Oldham's investigatory decisions in this case does not affect our conclusion that the circumstances became exigent ... when he learned from [his source] that appellant was likely to dispose of the shotgun.

*Id.* at 1145; *cf. Socey,* 846 F.2d at 1449 ("[T]he police should not be taxed for having failed to cover every eventuality."). Here, as in *McEachin,* the police were neither lazy nor inattentive to the Fourth Amendment's warrant requirement; on the contrary, the police carefully investigated the suspicious hotel guests for more than a week and sought warrants for all the

---

**3.** The record does not indicate how long the officers would have had to postpone their search to obtain an emergency search warrant. At oral argument, we were dismayed to learn that the government could not tell us what emergency search warrant procedures are available to the police in the evening. The District of Columbia Rules of Criminal Procedure require that the police prepare a written affidavit for each warrant that they request. *See* D.C.Code Ann. § 23–521. The Federal Rules of Criminal Procedure, on the other hand, permit the police

to seek warrants over the telephone, *see* Fed.R. Crim.P. 41(c)(2), which normally is more expeditious, *see, e.g., United States v. Whitfield,* 629 F.2d 136, 142 (D.C.Cir.1980) ("[W]ith telephonic warrants now permissible, ... the delay [in obtaining a warrant] may not be long at all."), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981). Neither procedure would have been onerous here, where the officers had already prepared an affidavit and had received written warrants for rooms 806, 903, and 918.

rooms that they could link to Halliman. Halliman tried to frustrate the warrant process by hopping from room to room. *See Halliman*, Crim. No. 89–00003–TFH, mem. op. at 9–10. After receiving Haynie's last-minute phone call about Halliman's most recent room hop, the police decided to execute the three warrants that they had rather than delay their sizable search operation. Although the police could have obtained an additional warrant prior to the search, their decision not to do so was reasonable under the circumstances.[4] Because it was justified by exigent circumstances, the warrantless entry was lawful.

### 2. Independent Source Doctrine

■ Since the police officers had a valid, emergency justification to enter room 900, they acted lawfully when they seized the bag of cocaine that was in plain view on the bathroom floor. *See Coolidge v. New Hampshire*, 403 U.S. at 465, 91 S.Ct. at 2037. Their lawful entry did not, however, authorize them to search the remainder of the room. An entry made under exigent circumstances "must be 'limited in scope to the minimum intrusion necessary to prevent the destruction of evidence.'" *Socey*, 846 F.2d at 1445 (quoting *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988)).

At the pre-trial hearing, Halliman argued that even if the officers' entry and seizure of the bag of cocaine were lawful, their search of the remainder of the room was not; accordingly, he argued, all evidence recovered pursuant to the search was inadmissible. The district court agreed with Halliman that the officers' initial recovery of drugs from the coat rack area was unlawful because Halliman had not consented voluntarily to a search there. *See Halli-*

*man*, Crim. No. 89–00003–TFH, mem. op. at 13–16. But the court then concluded that both the drugs and the evidence seized after the emergency warrant issued were admissible under the "independent source" doctrine. *See id.* at 16–20. Halliman contests the latter conclusion.

In *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Supreme Court held that "evidence which is initially discovered during an illegal search, but is subsequently acquired through an independent and lawful source," is admissible at trial. *Id.* at 539, 108 S.Ct. at 2534. Here, the "independent source" was the emergency search warrant for room 900. Under *Murray*, the district court properly admitted all evidence from room 900 unless "the [officers'] decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the [judge] and affected his decision to issue the warrant." *Id.* at 542, 108 S.Ct. at 2535–36 (footnote omitted).

The district court first found that the officers had not decided to obtain the emergency warrant on the basis of what they had seen in room 900. *Halliman*, Crim. No. 89–00003–TFH, mem. op. at 18. That finding is not clearly erroneous. The court also held that although the officers' warrant application stated that they had seized drugs from room 900's coat rack area, "under an objective standard, [that] information ... could not have affected the ... judge's decision to issue the emergency warrant." *Id.* at 19. We agree with the district court's conclusion that "there [were] overwhelming independent grounds for probable cause to believe that [room 900] contained narcotics." *Id.* At the time the D.C. Superior Court judge considered

---

**4.** The police might have been able to counter the suspects' tactics by seeking warrants for "all rooms paid for by Halliman or registered under his name." These warrants would satisfy the Fourth Amendment's particularity requirement so long as "'the officers ... [could] with reasonable effort ascertain and identify the place intended.'" *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir.) (quoting *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925)), *cert. denied*, —— U.S. ——, 109

S.Ct. 3242, 106 L.Ed.2d 590 (1989). In executing the warrants, the officers could have checked the Holiday Inn's records to "identify" the rooms connected to Halliman. That the police might have obtained a search warrant that anticipated Halliman's room-hopping tactics, and thus unrestricted to particular room numbers, is all the more reason not to declare the police's conduct unreasonable under the Fourth Amendment.

the warrant application, he reviewed copies of the warrants and affidavits supporting the warrants for rooms 903, 918, and 806. The information supporting the warrants for those rooms would have supported an additional warrant for room 900. *See supra* note 4. The Superior Court judge also reviewed information regarding the circumstances leading to the police's forced entry of room 900, and information about the narcotics found in plain view after the initial entry. This was more than enough evidence to support the judge's issuance of the emergency warrant.

### B. *Troy Phauls*

We turn now to Phauls's appeal. The district court denied Phauls's pre-trial motions to suppress the seventeen bags of crack found on his arm and to sever his trial from Halliman's. First, the court held that the bags of crack were admissible because they were the fruits of a search pursuant to a lawful arrest based on probable cause. *See Halliman,* Crim. No. 89–00003–TFH, mem. op. at 20–25. Second, the court held that it did not have to sever the defendants' trials because the joinder of the two defendants and their offenses satisfied the requirements of rule 8 of the Federal Rules of Criminal Procedure. *See id.* at 27. Phauls contests the court's denial of both pre-trial motions and further argues that the court abused its discretion under rule 14 of the Federal Rules of Criminal Procedure when it denied his motions to sever.

### 1. Probable Cause

■ The district court held that "the police had sufficient facts within their collective knowledge to give the arresting officers probable cause to arrest ... Phauls." *Halliman,* Crim. No. 89–00003–TFH, mem. op. at 21. We affirm the court's holding on the ground that Officer Nealis alone had enough information to make the arrest.[5]

■ "[P]robable cause exists if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been or is being committed." *United States v. Green,* 670 F.2d 1148, 1152 (D.C.Cir.1981). A combination of factors may establish probable cause even if each factor standing alone is insufficient. *See id.; United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir.1972). Here, Officer Nealis had been involved in drug investigations for over ten years and had made or participated in approximately 2000 drug arrests. Prior to arresting Phauls, Nealis had incriminating background information about two unidentified men who, along with Halliman, engaged in behavior typical of drug traffickers. Nealis also knew that that evening's searches had resulted in the recovery of drugs from rooms 900 and 903, and that Halliman had already been arrested. Nealis relied on Haynie's verbal tip and on his own observations to identify Phauls as one of the two unidentified men. As Phauls and Shannon walked down the ninth floor hallway, Haynie specifically pointed to Phauls as a member of Halliman's group who possessed a gun. Nealis then observed Phauls stop in front of room 903, a room he knew had contained some of the Halliman group's drugs. At that point, Nealis reasonably concluded that Phauls had engaged in criminal activity.

Phauls contends that we should disregard Haynie's identifying statement because Haynie did not base the statement on reliable information, Brief of Appellant Phauls at 25, and because "there was nothing in [the] statement itself that conveyed its veracity," *id.* at 24. Those reasons alone do not render Haynie's statement irrelevant. *See Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (noting that "an informant's 'veraci-

---

5. Because we hold that Officer Nealis had sufficient personal knowledge to arrest Phauls, we need not decide whether the district court erred in predicating its probable cause determination on the collective knowledge of the police force as a whole. *See, e.g., United States v. Whitfield,* 629 F.2d 136, 140 n. 6 (D.C.Cir.1980) (declining to decide whether collective knowledge standard applied because officer who conducted search knew enough personally to support probable cause), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981).

ty,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value" of an informant's tip, but that "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case"). As the principal contact for the Halliman investigation, Haynie had already proved to be a reliable informant. Moreover, Officer Nealis did not act on Haynie's tip until it was further corroborated by Phauls's conduct in walking toward, then hesitating in front of, room 903. Even were we to determine that the tip alone could not establish probable cause, we find no reason to ignore it as one of the totality of circumstances establishing probable cause for Phauls's arrest. *See, e.g., United States v. Lucas,* 778 F.2d 885, 888 (D.C. Cir.1985) (declining to determine whether anonymous tip alone would have justified arrest because tip was corroborated by suspicious activity).

Nor do we agree with Phauls's assertion that Officer Nealis improperly arrested him for associating with suspected criminals. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). As the district court pointed out, however, "the police here were aware of more than a momentary, casual, or random association among the defendants, the location, and Halliman." *Halliman,* Crim. No. 89–00003–TFH, mem. op. at 22.

In *United States v. Hillison,* 733 F.2d 692 (9th Cir.1984), the Ninth Circuit explained that association with suspected criminals can justify a finding of probable cause when "additional circumstances" exist. *See id.* at 697. The court noted that "[o]ne important consideration in assessing the significance of the association is whether the known criminal activity was contem-

poraneous with the association. Another is whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present." *Id.* (citations omitted). Those additional circumstances existed here. Phauls was one of the "consistent" guests who had behaved suspiciously at the hotel for over a month. Phauls's liaison with Halliman's group and Nealis's "well founded suspicion that [the Halliman group was] engaged in narcotics violations" during the time of Phauls's association, *id.,* gave Nealis reason to infer that Phauls was working as part of Halliman's drug-trafficking organization. *See id.* at 697–98. Nealis therefore had probable cause to arrest Phauls and to conduct a search incident to that arrest.

### 2. Rule 8(b) Joinder

Phauls also argues that the district court's denial of his pre-trial motion to sever was improper because the joinder of his trial with Halliman's violated rule 8 of the Federal Rules of Criminal Procedure. The district court held that no misjoinder occurred because the government had charged both defendants with possession of narcotics and had demonstrated that Phauls was associated with Halliman for a significant period of time before their arrests. *Halliman,* Crim. No. 89–00003–TFH, mem. op. at 27. We review the court's conclusion de novo, *see United States v. Lane,* 474 U.S. 438, 449 n. 12, 106 S.Ct. 725, 732, n. 12, 88 L.Ed.2d 814 (1986), and leave it undisturbed.

■ Rule 8(b) governs the joinder of defendants *and* offenses when there are multiple defendants. *See generally United States v. Jackson,* 562 F.2d 789, 793–97 (D.C.Cir.1977). Although the title and language of rule 8(a) state that it governs the joinder of offenses,[6] "the weight of authority in this circuit and elsewhere regards

---

6. Rule 8(a), entitled "Joinder of Offenses," states:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both,

are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses where more than one defendant is involved." *Id.* at 793. Rule 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Acts or transactions form a "series" within the meaning of the rule if they " 'constitut[e] parts of a common scheme or plan.' " *United States v. Perry,* 731 F.2d 985, 990 (D.C.Cir.1984) (quoting *Jackson,* 562 F.2d at 796).

██ In arguing that joinder was improper under rule 8(b), Phauls emphasizes that the government did not indict the two defendants in any common counts. Indeed, as Phauls points out, the indictment "did not allege or suggest that the drugs found on Phauls were connected to Halliman's drug activity[,].... that Phauls had obtained these drugs from Halliman, or that he was selling those drugs as part of Halliman's operation." Brief of Appellant Phauls at 11. In this circuit, however, the government need not demonstrate the propriety of its joinder decisions on the face of the indictment. *See Perry,* 731 F.2d at 990 ("[A] demonstration of the necessary relationship [between joined offenses]—and hence the benefit to the court of joinder—may be made by the Government at *some time before trial.*").[7] Rather, the government need only present evidence before trial that each defendant participated in the series of acts underlying each offense charged (though not necessarily in every act making up the series). *See id.* at 989 &

n. 4. Here, joinder was proper so long as the government presented evidence that Halliman's and Phauls's offenses arose out of their participation in the same drug distribution scheme.

██ Phauls and Halliman were arrested for their possession of drugs about the same time on the same floor of the same hotel. Before trial, the government offered proof that the spatial and temporal proximity of the offenses was not coincidental. At the pre-trial hearing, the government demonstrated that Phauls and Halliman had both frequented the Holiday Inn "for a significant period of time before their arrests." *Halliman,* Crim. No. 89–00003–TFH, mem. op. at 27. Most tellingly, the government presented evidence that Phauls had participated financially in the group's activities. Haynie testified that he remembered specifically that Phauls had paid for room 903—a room that had been rented in Halliman's name—the night before the arrests, and that Phauls probably had paid for the group's rooms "at least four or five times," mot. tr. at 169. Rule 8(b) requires only that the government "allege," not prove, the facts necessary to sustain joinder. The government's evidentiary presentation at the pre-trial hearing satisfied this requirement. *Cf. United States v. Chinchic,* 655 F.2d 547, 550–51 (4th Cir.1981) (joinder improper where "there [was] no evidence in the record connecting [two burglaries]" and where the government failed to offer "any evidence" in support of its theory that a common scheme existed).

### 3. Rule 14 Severance

██ Finally, Phauls contends that even if the initial joinder was proper, the district court erred in rejecting the motion to sever that he renewed after the defense had rest-

---

7. Other circuits have disagreed. *See United States v. Morales,* 868 F.2d 1562, 1567 (11th Cir.1989) ("Rule 8(b) is a pleading rule and joinder under Rule 8(b) is to be determined before trial by examining the allegations contained in the indictment."); *United States v. Kaufman,* 858 F.2d 994, 1003 (5th Cir.1988) ("The propriety of Rule 8 joinder is determined by the initial allegations of the indictment.").

*Compare United States v. Grey Bear,* 863 F.2d 572, 576 (8th Cir.1988) (en banc) (per curiam) ("[T]he propriety of joinder must appear on the face of the indictment") *with id.* at 583–84 (Gibson, J. concurring) ("we should ... recognize that in appropriate circumstances we may and should look beyond the indictment to determine if joinder is proper.").

ed. Rule 14 of the Federal Rules of Criminal Procedure permits a court to sever "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants." We review a district court's denial of severance for abuse of discretion, and reverse only if we determine that the movant did not get a fair trial. *United States v. Manner*, 887 F.2d 317, 324 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990).

A denial of a motion to sever is not an abuse of discretion "merely because a defendant 'might have a better chance of acquittal if tried separately.'" *Id.* (citations omitted). "Severance may be required," however, when "the evidence against one defendant is 'far more damaging' than the evidence against the other defendant." *Id.* (quoting *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C.Cir.), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988)). "The few cases in which we have overturned a trial court's denial of a motion to sever have involved clear disparities between the weight, quantity, or type of the evidence against the movant and against the other defendants." *Id.* In these cases, "[t]he critical determination [has been] ... whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Hernandez*, 780 F.2d 113, 119 (D.C.Cir.1986).

Phauls contends that "the great mass of evidence against Halliman was directed to [Halliman's] actual or constructive possession of the drugs found in rooms 900 and 903" and was not admissible against him. Brief of Appellant Phauls at 17. The district court's failure to exclude any of this evidence, Phauls concludes, "was extremely prejudicial." *Id.* at 18.

Even if we assume that these drugs would not have been admissible against Phauls at a separate trial, we hold that Phauls was not unfairly prejudiced by their admission here. The government introduced "independent and substantial evidence" bearing on Phauls's intent to distribute the drugs found on his person.

*United States v. Bruner*, 657 F.2d 1278, 1290 (D.C.Cir.1981). Phauls was arrested with almost eighteen grams of crack packaged in seventeen zip-lock bags. The government's expert witness testified that the drugs on Phauls's arm were "consistent with distribution based on the fact that you have approximately 1 [gram] of cocaine base to each bag, which is the common means of packaging it for distribution on the streets." Trial tr. at 455. She further testified that "if a person were to use [18 grams] for individual use, he would buy it bulk.... No one would go out and buy individual packages paying $100 for them when the same amount of coke can be purchased for a third or fourth of the price." *Id.* at 456. Haynie testified at trial that Phauls was a "regular" member of a group of hotel guests who had behaved for over a month like drug dealers, and pointed, specifically, to Phauls's payment for the group's rooms. We do not think that the evidence against Halliman was "far more damaging" than the evidence against Phauls.

Moreover, the risk of jury confusion in this case was minimal. The trial involved only two defendants who were indicted separately in three different counts. Throughout the trial, Phauls's lawyer resisted any attempts by the government to lump together the two defendants and their offenses; indeed, Phauls's lawyer introduced numerous witnesses, including Phauls himself, who testified that Phauls did not associate with Halliman, that he visited the Holiday Inn on only a number of occasions either with his girlfriend or with Shannon, and that he did not obtain the drugs on his person from Halliman's stockpile. In its final instructions, the district court admonished members of the jury to consider each defendant's guilt or innocence separately and reminded them that the first count of the indictment charged Halliman alone with possessing the drugs found both in rooms 903 and 900, that the second count charged Phauls alone with possessing the drugs found on his person, and that the third count charged Halliman alone with possessing the drugs found in room 900. We

therefore find insufficient cause to attribute the jury's guilty verdict against Phauls to its failure to segregate the relevant evidence in this case.

■ Finally, in objecting to the district court's instructions to the jury, Phauls did not argue that the court should have advised the jury that specific items of evidence were irrelevant to Phauls's guilt. Nor did Phauls propose a limiting instruction. *See Hernandez,* 780 F.2d at 120 (noting that "an appropriate limiting instruction might have insulated [the codefendant] from any undue prejudice"). Because he failed to object to the instructions on the ground that he now raises on appeal, Phauls can prevail only if the court's instructions were plain error. *See* Fed.R. Crim.P. 30; Fed.R.Crim.P. 52(b). They were not.

### III. Conclusion

The district court properly denied Halliman's and Phauls's motions to suppress evidence and Phauls's motions to sever his trial. Accordingly, the convictions of Hugh Halliman and Troy Phauls are

*Affirmed.*