UNITED STATES of America,
Plaintiff,

v.

Andre JENKINS, Nathaniel S.
Thompson, Defendants.

No. 1:03 CR 112.

United States District Court,
N.D. Ohio,
Eastern Division.

June 15, 2003.

Samuel A. Yannucci, Office of U.S. Attorney, Akron, OH, for Plaintiff.

Thomas S. Hudson, Sarasota, FL, for Defendant Andre Jenkins.

Jeffrey P. Saffold, Roger M. Synenberg, Cleveland, OH, for Defendant Nathaniel S. Thompson.

## MEMORANDUM OF OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO SUPPRESS

WELLS, District Judge.

Before the Court are three motions to suppress. In his first motion, Mr. Jenkins seeks to suppress the $68,000 in U.S. currency, $17,000 Rolex watch, and two firearms found during the search of Bonnie Jones' residence at 11906 Imperial in Cleveland. (Docket # 16). In his second motion, Mr. Jenkins seeks suppression of the 73 kilograms of cocaine discovered during the search of Room 127 of the Holiday Inn in Beachwood, Ohio. (Docket # 28). Mr. Thompson moves to suppress only the cocaine from the hotel room. (Docket # 35). The government filed oppositions to the three motions. (Docket # 36, 37). An extensive three-day evidentiary hearing was held on 29 May 2003, 3 June 2003, and 4 June 2003.

Based on the evidence adduced at the suppression hearing and the relevant law, this Court will grant each of defendants' motions to suppress.

### I. FACTUAL BACKGROUND

The facts surrounding the two searches at issue are largely undisputed. At approximately 11:00 p.m. on 13 February 2003, two men, who turned out to be Andre Jenkins and Nathaniel Thompson, entered the Beachwood Holiday Inn off the exit at Route 271 and Chagrin Boulevard and inquired about renting a room. Mr. Jenkins did most of the talking, but Mr. Thompson provided his ID, which showed that he lived on the east side of Cleveland. They rented Room 127 for two days and paid in cash. Robert Jeffreys, the front office manager who checked-in the men, issued only one electronic room key but did not see which man took the key. Mr. Jeffreys observed the men straining to unload bags from a black Ford Explorer onto a luggage cart. Suspicious of this behavior, Mr. Jeffreys wrote down the license plate number of the Ford Explorer. He then called Officer John Kornek of the Beachwood Police and of the High Intensity Drug Trafficking Area Task Force ("HIDTA"). Mr. Jeffreys relayed his observations to Officer Kornek and told him that the two men had left the hotel after unloading the bags and pushing the cart down the hallway towards Room 127. Mr. Jeffreys had provided information to Officer Kornek on several past occasions.

Officer Kornek, in turn, called Officer Kevin Grisafo of the Beachwood police and HIDTA. After being told what Officer Kornek knew, Officer Grisafo drove to the Holiday Inn. He spoke with the Holiday Inn desk staff and reviewed the registration slip for Room 127, which showed that the room was registered to Nathaniel Thompson. Officer Grisafo walked past the room and noticed that a "Do not disturb" sign was hanging on the door. At this point, Officer Grisafo ran a criminal history check on Mr. Thompson and on Bonnie Jones, the woman to whom the black Ford Explorer was registered. Each had a criminal record. Officer Grisafo acquired the room across the hall from Room 127 and contacted IRS Special Agent Mark Kahler of HIDTA, who sent three officers to conduct surveillance from the acquired room. Officer Grisafo watched the hotel from his unmarked vehicle in the Olive Garden restaurant parking lot across the street.

At approximately 4:30 a.m., a black Suburban entered through the south entrance of the Holiday Inn lot, immediately left through the north entrance, turned

around, re-entered the Holiday Inn lot, dropped off a female at the main lobby, then left again, and parked at the Super 8 motel lot across and farther up the street. The Holiday Inn parking lot was mostly empty. The driver of the Suburban, Mr. Jenkins, half-jogged over to the side entrance of the Holiday Inn, used an electronic room key card to enter, met with the female who had been sitting in the lobby, and entered Room 127 with her. A license plate search of the Suburban showed that it was registered to a Lacell Torrence, whose criminal history showed that he had been arrested on several occasions.

At 8:30 a.m., on 14 February, a police canine was walked around the Suburban in the Super 8 lot and gave a positive indication for the presence of narcotics in the vehicle. At about 11:55 a.m., Mr. Jenkins left Room 127 and headed for the Suburban in the Super 8 parking lot carrying towels. At this time, none of the officers knew his identity. After Mr. Jenkins placed the towels in the back of the Suburban, FBI Agent Kenneth Riolo of HIDTA confronted him. Mr. Jenkins gave his name, stated that he had been applying for a job across the street, and denied having any knowledge of Room 127 or the woman in the room. Agent Riolo arrested Mr. Jenkins and found on his person a small amount of marijuana, $1500 in cash, two cell phones, and a pager. Officer Grisafo then arrived on the scene. Agent Riolo told him and two other officers, Kornek and Guerra, to secure Room 127 in anticipation of a search warrant, which Agent Kahler had been preparing throughout the night while receiving updates from Officer Grisafo. Agent Riolo testified that he was concerned that the woman in the room may have witnessed the commotion in the Super 8 parking lot because two marked cruisers were present for Mr. Jenkins' arrest and there was a clear view from the window of Room 127 to the parking lot.

He stated that he wanted to secure the room in order to prevent the destruction of any evidence there.

There is conflicting testimony as to how the police entered Room 127. Officers Grisafo and Kornek testified that Sergeant Guerra knocked on the door, which the woman, later identified as Joyce Bell, opened. According to the officers, they identified themselves and told her that they were securing the room and were in the process of obtaining a search warrant. They testified that Ms. Bell, dressed in panties only, let them in. Officer Kornek then took Ms. Bell to the chair at the far side of the room, which he first checked for weapons, so she could get dressed and be questioned. He patted down her clothes before she put them on.

Ms. Bell describes the situation differently. According to her, a female housekeeper knocked on the door. Ms. Bell then opened the door partially and placed her arm out to collect towels. She said she was using the door as a shield because she was wearing only panties. Ms. Bell testified that the officers "busted in the room," pushing the door open with enough force to hit her in the face and knock her onto the ground and into the closet. She testified that a gun was pointed at her. As Ms. Bell explains it, the officers did not identify themselves for several minutes.

Testimony regarding the bags in the room and Ms. Bell's purported consent to a search is more consistent. According to Ms. Bell, when she entered Room 127 the night before, a few duffle bags had been placed between the two beds. She did not touch the bags. Mr. Jenkins later moved the bags so that they were between the length of one bed and the wall. Ms. Bell testified that this is where the bags were when the police entered. This correlates with what Officer Kornek said about the bags: when he first entered the room,

three full bags were stacked along the wall with one empty bag lying nearby. There was a large black bag on the bottom of the stack with a green bag in the middle and another black bag on the top. Officer Kornek testified that, although he and Ms. Bell did not touch the bags, he noticed one of the bags, the green bag, on the bed a short time later. The zipper of the green bag was partially open. Officer Kornek testified that this only became visible after the black bag on the top of the pile was moved. He said he did not know how the bag was moved; he had not been paying attention to the activities of the other officers, who could have "grabbed" or opened the bags.

Instead, Officer Kornek was interviewing Ms. Bell. A few minutes after the initial entry, he asked Ms. Bell if she had a problem with the officers searching the room and the bags in particular. According to Officer Kornek, Ms. Bell stated "no, not at all, they are not [mine] and [I don't] know what's in them." Ms. Bell's testimony is consistent in this regard. She testified that she consented to the search. However, Ms. Bell told Officer Kornek that she was just a student, the room was not hers, and that she was just there with Mr. Jenkins.

Officer Grisafo also testified that Ms. Bell consented to a search of the room and all its contents. Once he heard the consent, Officer Grisafo, who had been standing in the doorway, moved further into the room. He testified that, having moved into the room far enough to see the bed, he saw a pile of two or three bags between the wall and the bed and one bag on top of the bed. According to Officer Grisafo, "I saw the bag that was on the bed was wide open and I could see brick type items in there wrapped in cellophane, which from prior history, this is how narcotics is wrapped." Officer Grisafo said that the bag was so full that "it was unzipped

enough where it was pulling apart." He testified that he did not know the location of the bags at the time of the initial entry and could not see from the doorway whether another officer moved the bags in those first few minutes. He testified that he did not touch the bags.

About five minutes after the initial entry, Agent Riolo entered the room. He saw the room key sitting on the night stand between the beds. He also saw at least the green bag, and maybe a black bag, on the bed. The large black bag was against the wall. According to Officer Riolo, the zipper of the green bag was partially open such that he could see orange items inside. The officers informed him that Ms. Bell had consented to a search, but Agent Riolo told them that they were going to wait for a warrant. At that point, according to his own testimony, Agent Riolo proceeded to pick up and squeeze the bags. He stated, "I picked all the bags up and felt them to see how heavy they were. They were full." He went on to say, "the biggest bag on the floor was probably about a hundred pounds ... The other bags were all heavy and you could feel the bricks inside." When asked during the hearing why he picked up the bags before a warrant was obtained, Agent Riolo testified, "I just felt I should touch them and see what there was inside. If it was soft and it was clothes or maybe, I just wanted to feel them and see how heavy they were and get that information back to Mr. Kahler." Agent Riolo also explained that he squeezed the green bag, and that, from the squeeze, he determined that there were brick-like objects in the bag.

As Agent Riolo entered the room, Officer Grisafo left to meet Agent Kahler at the HIDTA office to complete work on the warrant affidavit. Shortly thereafter, Ms. Bell was taken from the room. According

to Ms. Bell, this occurred five to ten minutes after the initial police entry. She testified that, before she left, she saw the officers opening drawers and looking behind curtains.

Before Officer Grisafo had returned to HIDTA headquarters, Agent Kahler had been informed of the presence of brick-like objects in the bags. Agent Kahler and Officer Grisafo completed their work on the warrant affidavit and drove to the Justice Center in order to present the search warrant for Room 127 to a judge for signature. On the way, Agent Kahler spoke with an assistant county prosecutor, who told him to make sure that the judge was told that the room had been secured.

Agent Kahler had made a conscious decision to exclude any mention of the hotel informant in the affidavit in order to protect the source. The observed presence of brick-like objects also was omitted from the affidavit. When Agent Kahler and Officer Grisafo met with Judge Brian Corrigan, however, the officers orally communicated everything they knew about the situation to the judge. Agent Kahler testified that he was certain that he told the judge that officers had observed brick-shaped items in the bags. He reiterated this point during his testimony, stating that there was no doubt in his mind that this information was relayed to Judge Corrigan.

Judge Corrigan signed the search warrant at 1:30 p.m. on 14 February. Still in the judge's chambers, Officer Grisafo notified Agent Riolo, in Room 127, who then opened the green bag, pulled out a brick, and confirmed that it was cocaine. This information was immediately passed on to the judge. A total of 73 kilogram-bricks of cocaine were found in the bags.

Later that day, at 5:30 p.m., Mr. Jenkins was being booked at the county jail. Three or four times, he asked Corrections Officer Eugene Sanchez, who he knew from prior jail stays, if he could make a phone call. As this was not permitted, Officer Sanchez ripped a piece of a brown paper bag and gave it to Jenkins to write the name and number of the person he wanted to call. Officer Sanchez told Mr. Jenkins that he would place the call on his behalf, although he did not do so. Mr. Jenkins wrote down the name "Bonn" and a phone number. He told Officer Sanchez to "let Bon know to clean up, they are coming." Officer Sanchez relayed this information to Officer Kornek, who traced the phone number to a Mr. Jones at 11906 Imperial.

Once Officer Randy Wilson of the City of Independence police and HIDTA was given this information, he began preparing a search warrant for 11906 Imperial. He testified that he understood from what he had been told that Mr. Jenkins' said "get the shit out, the police are coming." He and Agent Kahler went to Judge Corrigan's residence between 10:00 p.m. and 10:30 p.m. that evening. Judge Corrigan signed the warrant for 11906 Imperial, which was executed that night. $68,000 in U.S. currency, a $17,000 Rolex watch, and two firearms were found during the search of Bonnie Jones' residence at 11906 Imperial.

## II. LAW AND ANALYSIS

There are several issues before the Court. First, there is a question as to whether Mr. Jenkins has standing to raise his Fourth Amendment challenges. Second, the government and the defendants disagree as to whether Joyce Bell's consent to search Room 127 and the bags within it was valid. Third, the defendants contend that there were no valid exigent circumstances to justify the warrantless entry into Room 127. If there was a valid exigency, the defendants argue that the officers exceeded the scope of the exigency

while in the room. Next, the defendants argue that the warrant for Room 127 was defective and could not reasonably be relied on by the officers. Finally, there is the question of the validity of the warrant and search of 11906 Imperial. The Court will address these issues in turn.

## A. Standing

The government contests Mr. Jenkins' standing to assert Fourth Amendment claims with respect to Room 127 of the Holiday Inn and the residence at 11906 Imperial.

 A defendant has the burden of establishing his standing to challenge a search in violation of the Fourth Amendment. *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988). According to the Sixth Circuit, "[t]he defendant must satisfy a two-part test: (1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and (2) whether society is prepared to recognize that expectation as legitimate."

 Mr. Jenkins has established his standing to challenge the search of Room 127. He entered the room with an electronic key and spent the night there. There is no question that he had an expectation of privacy in the hotel room where he slept and that such an expectation is legitimate. Federal courts consistently have held that hotel rooms, like residences, can create an expectation of privacy for Fourth Amendment purposes. *United States v. Allen*, 106 F.3d 695, 698 (6th Cir.1997); *Minnesota v. Olson*, 495 U.S. 91, 95–99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

 Mr. Jenkins also has standing with respect to the search of 11906 Imperial. The owner of the house, Bonnie Jones, testified at the hearing. She stated that Mr. Jenkins had been her boyfriend for four years and that, at the time of the search, he was living with her at 11906 Imperial, as he had done for the last two years. According to Ms. Jones, Mr. Jenkins slept at the house approximately five nights a week, kept clothes and personal effects in the house, and occasionally received mail there. She stated that he had full access to the residence. She also testified that she was not aware of any other place he had to stay.

Aside from an isolated reference by an officer to a statement made by Ms. Jones' daughter that Mr. Jenkins slept in the house only once every week or two, Ms. Jones' testimony is uncontradicted. This Court finds that Mr. Jenkins did live and sleep at 11906 Imperial and, therefore, had an expectation of privacy in the residence and his effects there. No authority need be cited for the proposition that one's expectation of privacy in one's home is recognized by society as legitimate.

Thus, Mr. Jenkins has standing to challenge the searches of Room 127 and 11906 Imperial.

## B. Consent to Search Room 127

The defendants contend that Joyce Bell's consent to the search of Room 127 and the duffle bags was invalid. Specifically, they argue that (1) she lacked actual or apparent authority to consent to the search and (2) her consent was involuntary. As the first argument is dispositive, the Court will not examine the second.

 The Fourth Amendment generally prohibits the warrantless entry of a person's home or hotel room to search for specific objects. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). However, this prohibition does not apply to situations in which voluntary consent has been obtained from the individual whose property is to be searched or from a third party who possesses common authority over the premises. *Id.* Common

authority rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock,* 415 U.S. 164, 172, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Even if the person giving consent does not have actual, common authority over the premises, the consent is valid if the person has apparent authority. In such a situation, a search pursuant to consent is valid if the facts available to the officer at the time would lead the officer to reasonably believe that the consenting party has authority over the premises. *Rodriguez,* 497 U.S. at 188–189, 110 S.Ct. 2793. This is an objective standard. *Id.* In the end, the burden is on the government to prove by a preponderance of the evidence that a consent is valid. *Matlock,* 415 U.S. at 177, 94 S.Ct. 988.

■ Ms. Bell did not have actual authority to consent to a search of Room 127 or the bags within it. The room was registered to Nathaniel Thompson, not her. She was not present when Mr. Thompson and Mr. Jenkins checked-in to the room. There is no evidence that she paid any portion of the rent for the room. All the testimony indicates that she arrived at 4:30 a.m. and was merely a night-time guest. Ms. Bell herself testified that it was not her room and that she was just there with Mr. Jenkins. She initially obtained access to the room only because Mr. Jenkins opened the door with the electronic key he had. Although there is testimony from Agent Riolo indicating that Mr. Jenkins left the key with Ms. Bell when he departed at 11:55 a.m. on 14 February, Ms. Bell testified that she was not aware of the presence of the key.

Moreover, Ms. Bell did not have common authority over the bags. She testified that the bags were not hers and that she never touched them. All of the testimony establishes that Mr. Thompson and Mr. Jenkins transported the bags to the room, not her. Thus, Ms. Bell did not have use of the bags or control over the bags. Ms. Bell testified that Mr. Jenkins told her to tell the housekeeper not to touch the bags. Mr. Jenkins, therefore, did not assume the risk that she would consent to the searching of the bags.

■ Ms. Bell did not have apparent authority over the bags either. No officer could have reasonably believed that she had authority to consent to the search of the room or the bags. The officers on the scene knew that the room was registered to Mr. Thompson, that he or Mr. Jenkins paid for the room, and that Ms. Bell only arrived at 4:30 a.m. Ms. Bell explicitly told them that it was not her room and that she was there with Mr. Jenkins. Furthermore, the officers knew only of Mr. Thompson and Mr. Jenkins transporting the bags. Ms. Bell explicitly stated that the bags were not hers when she consented to the search. Under these circumstances, the officers could not reasonably believe that Ms. Bell had authority to consent to a search of Room 127 or the bags.

As the government has failed to meet its burden of demonstrating that Ms. Bell had actual or apparent authority to consent to a search of Room 127 or the bags within, her consent is invalid and cannot justify any warrantless entry or search.

**C. Warrantless Entry and Search of Room 127**

■ The next issue concerns the alleged warrantless entry and search of Room 127. The defendants allege that the officers entered Room 127 without a warrant and in the absence of exigent circum-

stances and that, even if exigent circumstances were present, their search of the bags exceeded the scope of the exigency. The government counters that the possible destruction of evidence justified securing the room and, in conjunction with officer safety concerns, justified remaining in the room for some time before a warrant was obtained. This Court will assume, without deciding, that the exigencies asserted by the government were present and justified the securing of Room 127 in anticipation of a warrant. However, the Court finds that the officers' search of the bags exceeded the scope of the exigencies and, therefore, violated the Fourth Amendment.

■■■ The Sixth Circuit has explained,

> Warrantless searches [of residences and hotel rooms] are per se unreasonable under the fourth amendment, except in a few carefully delineated instances. The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant. Under exigent circumstances, a warrantless entry may be required to secure evidence that is in the process of being lost or destroyed. Such warrantless entries and searches are "presumptively unreasonable." Therefore, the government bears the "heavy burden" of demonstrating exigency.

United States v. Radka, 904 F.2d 357, 360–361 (6th Cir.1990) (internal citations omitted). The possible destruction of evidence or a risk of danger to police or others are two situations that can satisfy the exigent circumstances exception. United States v. Johnson, 22 F.3d 674, 680 (6th Cir.1994). However, "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation." Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). See also, Johnson,

22 F.3d at 680; United States v. Socey, 846 F.2d 1439, 1445 (D.C.Cir.1988) (stating "Once police officers have the requisite belief that destruction of evidence is imminent, their entry must be limited in scope to the minimum intrusion necessary to prevent the destruction of evidence"); United States v. Halliman, 923 F.2d 873, 880 (D.C.Cir.1991) (same).

The government argues that the possible destruction of any evidence in Room 127 justified the officers' warrantless entry to secure the room. The officers' concern was that the woman in the room, whose identity was unknown to the police, could have seen the arrest of Mr. Jenkins and proceeded to destroy evidence. The officers also testified to their concern that, once in the room, they needed to ensure that no one entered through the window (to either destroy evidence or harm someone). Several officers testified that they were unsure of Mr. Thompson's location and thought that he might return to the room and threaten officer safety.

For the purpose of this analysis, the Court will assume that the destruction of evidence and officer safety concerns justified a warrantless entry to secure the room. Nevertheless, the testimony of the officers themselves demonstrates that their actions went beyond the scope of these exigencies. From their surveillance, the officers knew that there was no one but Ms. Bell in the room to destroy evidence. To prevent the destruction of evidence, the officers only needed to remove Ms. Bell from the hotel room when she opened the door and then close and guard both the door and the window. If officers were posted at the door and window, the officers could be sure that no one else could enter to destroy evidence. The obvious presence of officers also would likely alleviate any threat to officer safety. Officer Grisafo testified that, if officers were

so posted, he believed that Mr. Thompson would not return to present any danger. He also testified that they could have brought Ms. Bell to their room across the hall and that he considered the room secured when he had Ms. Bell under his control. Officer Kornek testified that there was no officer safety concern once he saw Ms. Bell in only panties with no weapon.

Yet, instead of securing and sealing the room or even securing and simply remaining in the room, the officers proceeded to conduct warrantless searches of the room. There were two distinct searches that were not justified by the exigent circumstances.

 First, before Agent Riolo arrived in the room, one of the officers moved some of the bags. Based on the testimony of Joyce Bell and Officer Kornek, this Court finds that, at the time of the initial entry, three bags were stacked against the wall with one bag lying on the floor nearby. The Court also finds, based on the testimony of Officer Kornek and Officer Grisafo, that, shortly after the entry, at least one bag was on the bed. As Officer Kornek testified that Ms. Bell did not touch the bags, one of the three officers must have moved the bags. Further, the officers testified that they could see into the bag on the bed because it was partially unzipped. As Officer Kornek testified, this opening became visible only after the bag on the top of the pile was moved. Thus, an officer moved a bag from the pile to the bed and, in so doing, allowed the officers to see into the bag in a way they could not have done had it not been moved. Under Supreme Court precedent, this is a search. In *Arizona v. Hicks*, the Supreme Court held that moving suspicious stereo components in order to examine their serial numbers was a search. 480 U.S. 321, 323–326, 107 S.Ct. 1149, 94 L.Ed.2d 347. Similarly to the officer in *Hicks*, the officers here moved a bag without a warrant and then peered inside the newly-visible opening.

 The second warrantless search of the bags was initiated by Agent Riolo. Based on Agent Riolo's testimony, this Court finds that he picked up each of the bags and squeezed at least one of them. His only rationale for these actions was that he "felt he should touch them and see what was inside." The squeezing of the bags led Agent Riolo to the conclusion that there were bricks inside. Under Supreme Court precedent, this picking up and squeezing of the bags is a search. In *Bond v. United States*, an officer squeezed the soft luggage of bus passengers without a warrant. 529 U.S. 334, 335–336, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). Noting that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection," the Supreme Court held that the squeeze was a search. *Id.* at 337, 120 S.Ct. 1462.

Neither of these warrantless searches was justified by concerns of destruction of evidence or officer safety. The room was secure and the only non-officer in the room was unarmed, getting dressed, and being questioned. No one needed to move, pick up, or squeeze bags to protect evidence or officer safety. Doing so was unnecessary and exceeded the scope of the exigent circumstances. Accordingly, the officers violated the Fourth Amendment with these warrantless searches, which fell outside the scope of the prevailing exigencies.[1]

 The subsequent search warrant obtained for Room 127 does not re-

---

1. In making this determination, the Court does not rely on Joyce Bell's testimony that officers were opening drawers.

move the taint of these illegal searches. "Under the independent source doctrine, evidence will be admitted if the government can show it was discovered through sources 'wholly independent of any constitution violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir.1996). Thus, if the subsequent warrant was "wholly independent" of the illegal searches of the bags, the cocaine in the bags would be admissible. Here, however, the warrant was not "wholly independent" of the illegal searches. Agent Kahler testified that he knew that there were brick-like objects inside the bags (the results of the illegal searches) and is certain that he relayed this information to Judge Corrigan before the judge signed the warrant for Room 127. The fruits of the illegal searches, then, were one of the pieces of information made available to Judge Corrigan before he issued the warrant. Because the warrant was not "wholly independent" of the illegal searches, the independent source doctrine does not apply here.

 "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (internal citations omitted). As the warrantless searches of the bags were unlawful, the 73 kilograms of cocaine found in the bags must be suppressed under the exclusionary rule.

**D. Search of 11906 Imperial**

 Under the fruit of the poisonous tree doctrine, "the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the

unlawful search becomes so attenuated as to dissipate the taint." *Murray*, 487 U.S. at 536–537, 108 S.Ct. 2529 (internal quotation marks omitted). Where factual statements regarding products of an illegal search are contained in a subsequent warrant affidavit, the question "is whether, despite any impermissibly tainted factual averments in the affidavit, the warrant nevertheless issued upon probable cause." 8 Fed.Appx. 408, 411 (6th Cir.2001).

In this case, the affidavit for the search warrant for Bonnie Jones's residence at 11906 Imperial includes "tainted factual averments" from the illegal searches of the bags in Room 127. In its entirety, the affidavit recounts (1) Mr. Thompson's check in at the hotel; (2) Mr. Thompson's arrival in the Ford Explorer registered to Bonnie Jones, who lives at 11906 Imperial; (3) Mr. Thompson's criminal record; (4) the arrival of Mr. Jenkins and Ms. Bell in the Suburban registered to Lacell Torrence, who also had a criminal record; (5) the police canine's positive indication for the presence of narcotics in the Suburban; (6) the small amount of marijuana and $1500 found on Mr. Jenkins when he was arrested; (7) the 73 kilogram-packages of cocaine found in Room 127; (8) the interaction of Mr. Jenkins and Mr. Thompson at a garage; (9) Mr. Jenkins' statement to Corrections Officer Sanchez and the sheet of paper with the name "Bonn" and a phone number that traced back to 11906 Imperial; and (10) the observed presence of the Ford Explorer in the driveway of 11906 Imperial.

The question is whether there was probable cause to believe that there was evidence of illegal drug activity at 11906 Imperial once the facts relating to the fruits of the illegal searches are eliminated from the warrant affidavit. The warrant cannot rely on the 73 kilograms of cocaine found in Room 127. Moreover, without referring

 **1011**

to the drugs transported in the Ford Explorer, little significance can be assigned to the links between the Ford Explorer and 11906 Imperial. There is no demonstrated link between the Suburban and 11906 Imperial. Essentially, the affidavit is left with the following facts to support a search warrant: (1) Mr. Jenkins, who was in the Ford Explorer which was registered to the resident of 11906 Imperial, was found with a small amount of marijuana on his person and (2) Mr. Jenkins told Officer Sanchez to "let Bonn know to clean up, they are coming" and gave him a telephone number for 11906 Imperial. This is simply not enough to establish probable cause to search 11906 Imperial. That a man with some relationship to a residence is found carrying marijuana does not provide probable cause to believe that there are drugs in the residence. Mr. Jenkins' statement does not refer to what should be cleaned up or where. Without reference to the cocaine discovered shortly before he made his statement, the statement loses most of its significance. In the end, there is no reliable link between any drug activity and the residence at 11906 Imperial.

Accordingly, there was no probable cause to search 11906 Imperial and the search warrant was defective. The $68,000 in U.S. currency, $17,000 Rolex watch, and two firearms found during the search of Bonnie Jones' residence at 11906 Imperial must be suppressed.

### III. CONCLUSION

For the reasons discussed above, the three motions to suppress are granted. At trial, the government may not introduce into evidence the 73 kilograms of cocaine found in Room 127 or the $68,000 in U.S. currency, $17,000 Rolex watch, and two firearms found at 11906 Imperial. Nor may the government offer testimony concerning knowledge acquired during the un-

lawful searches of the bags in Room 127 or of the residence at 11906 Imperial.

IT IS SO ORDERED.