# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 12, 2011      Decided January 6, 2012

No. 07-3106

UNITED STATES OF AMERICA,
APPELLEE

v.

LARRY A. GOOCH, JR.,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00128-23)

*Stephen C. Leckar*, appointed by the court, argued the cause and filed the briefs for appellant.

*Elizabeth Gabriel*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen*, U.S. Attorney, and *Roy W. McLeese III*, *Mary B. McCord*, and *John P. Dominguez*, Assistant U.S. Attorneys.

Before: GINSBURG,* *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

---

   * As of the date the opinion was published, Judge Ginsburg had taken senior status.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Appellant, Larry Gooch, was tried for various crimes arising from his involvement in the "M Street Crew," a gang in Washington, D.C. By jury verdict returned on June 1, 2007, Appellant "was found guilty of a narcotics conspiracy, participation in a Racketeer Influenced Corrupt Organization ('RICO'), drug dealing, four felony murders, assault with intent to kill while armed, assault on a police officer, three violent crimes in aid of racketeering activity ('VICAR'), and various gun charges." *United States v. Gooch*, 514 F. Supp. 2d 63, 64 (D.D.C. 2007).

On appeal, Appellant advances several claims as grounds for reversal. First, he contends that the District Court clearly and plainly erred in allowing the Government to use peremptory challenges to remove qualified blacks from the venire, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Second, he argues that the District Court erred, under Rule 8 of the Federal Rules of Criminal Procedure, in rejecting his challenge to the joinder of local and federal charges stemming from the murders in August 2000 of William Cunningham and Christopher Lane. Third, he asserts that the District Court erred, under Rule 14 of the Federal Rules of Criminal Procedure, in denying his motion for severance of counts relating to the Cunningham/Lane incident, as well as his motion to vacate judgment as to the Cunningham/Lane incident. Finally, he maintains that the District Court erred in denying his motion for judgment of acquittal on two counts of murder pursuant to the VICAR statute, 18 U.S.C. § 1959 (2006), arising from the murders of Calvin Cooper and Yolanda Miller. Because we find no reversible error, we reject Appellant's claims and affirm the judgment of the District Court.

## I. BACKGROUND

For nearly two years, the Federal Bureau of Investigation and the Metropolitan Police Department conducted a series of undercover and surveillance operations in the Northeast area of Washington, D.C.  These law enforcement operations focused on a gang known by its location as the M Street Crew.  In March 2004, law enforcement officials executed a massive "take down" of the organization.  Gooch, along with more than thirty other persons, was arrested.  In October 2005, Gooch and eighteen others were charged in an 159-count indictment with various narcotics conspiracy, racketeering conspiracy, murder, narcotics trafficking, and weapons crimes.  The charged parties were divided into three groups for trial.  Gooch was in a group that included Tommie Dorsey, Jonte Robinson, and Kenneth Dodd.

A superseding indictment was filed on October 19, 2005. Charges arising from the Cunningham/Lane murders were joined in the indictment.  Offenses related to the murders were charged as substantive offenses under the D.C. Code. Superseding Indictment, App. to Appellant's Br., Vol. IB ("App. IB") at 57–63.  They were also charged as overt acts in furtherance of the narcotics and RICO conspiracies.  *Id.* at 14–15, 40.

Jury selection began in January 2007.  The record leaves the matter unclear on this point, but it seems that the jury pool included either sixty-four or seventy-four people, half of whom were black.  *See* Tr. of *Batson* Hearing, Feb. 5, 2007 ("Tr. 2/5/07"), App. to Appellant's Br. Vol. IIB ("App. IIB") at 1022–23.  During voir dire, the Government appears to have struck sixteen blacks, five whites, and one Latino from the jury pool. Appellee's Br. at 18–19.  A jury of eighteen, including six alternates, was chosen.  The jury consisted of eight whites, eight blacks, one Asian, and one Latino.  *Id.* at 19.  On February 5, after the jury had been selected, Gooch raised a *Batson* challenge, claiming that the Government disproportionately used

its peremptory strikes to remove black persons from the jury pool. The District Court asked the Government to articulate reasons for its strikes of black females from the pool of persons available for jury duty. The Government responded by offering explanations for each of its peremptory challenges.

Gooch challenged the Government's explanations with respect to Jurors 408, 854, and 1940. The District Court denied his challenges, finding that the Government had "fully explained in a race neutral way each of its strikes." Tr. 2/5/07 at 1029. Counsel for Gooch then requested leave to raise "similarly situated" objections, indicating that he would like time to perform a comparative analysis of stricken black jurors with those who remained in the jury pool and that he would do so that night. The trial judge granted Appellant's request but instructed counsel to be prompt if he intended to raise any similarly situated objections. Gooch's counsel never raised the issue again, so it was not among the *Batson* claims raised by Appellant with the District Court.

On January 17, 2007, after the jury had been selected but before trial, Dodd, Robinson, and Dorsey each entered plea agreements and were no longer co-defendants. Docket, App. to Appellant's Br., Vol. IA at 149. Gooch proceeded to trial as the sole defendant.

Trial began on February 7, 2007. The evidence adduced at trial documented Gooch's role in the gang and implicated him in two double homicides. Gang members coordinated their drug-dealing efforts, cooperated with one another to avoid arrest and imprisonment, and maintained a reputation for violence. The evidence at trial further established that Gooch served as the "muscle" for the M Street Crew, enforcing the gang's rules, engaging in violence, and punishing disloyalty to the gang.

During trial, a great deal of testimony centered on the August 1, 2000 robbery and murders of Cunningham and Lane.

Herbert Jones ("Jones"), the uncle of Bonita Jones (who was the mother of Gooch's child), asked Gooch to rob Cunningham and Elijah Walker. Jones had heard that Cunningham and Walker planned to rob him, and he wanted to take preemptive action against his adversaries. Gooch, along with fellow M Street Crew members Dorsey and Robinson, picked up Jones in Gooch's car. After they arrived at the place where Cunningham lived, Gooch, Jones, and Dorsey went to the residence while Robinson waited at the car. When Cunningham came to the door, Gooch pulled out a gun and told Cunningham to get on the floor. Cunningham refused and tried to grab the gun. But Gooch turned Cunningham around and shot him in the head. Dorsey then shot Lane, who was also in the residence.

After the murders, Robinson entered the residence and stole money from the bedroom, where Jones instructed him that he could find it. Gooch, in turn, took crack cocaine from Cunningham's dining room table. The next day, Gooch attempted to give Jones some of the money from the heist, but Jones refused. Gooch later discussed the incident with Michael Abney and Carleton Wills, who were either members or associates of the M Street Crew.

The Government charged the August 1, 2000 Cunningham/Lane incidents (burglary, robbery, and murder) as substantive offenses under the D.C. Code, as well as overt acts in furtherance of both the narcotics and RICO conspiracies. In a pre-trial motion, Appellant claimed misjoinder under Rule 8 of the Federal Rules of Criminal Procedure and sought severance of these charges on the grounds that the Cunningham/Lane incidents had no connection to the larger narcotics and RICO conspiracies. The District Court denied Gooch's motion.

In the course of the trial, the Government also presented evidence on the February 21, 2003 murders of Cooper and Miller. Apparently, the "word on the street" was that Cooper and Miller were "snitching" and "stealing stashes." Trial Tr.,

March 27 p.m., 2007 ("3/27/07 p.m."), App. for Appellee at 58. Miller even admitted to stealing stashes. Trial Tr., Mar. 22 p.m., 2007 at 66–67, 69. On the night of the murders, Wills heard gunshots and witnessed both Gooch and Cooper running out of an alley onto 17th Street, N.E. Cooper fell to the ground, but Gooch kept running and disappeared between two buildings. Officer Keith McAbee also saw two men coming out of the alley. Officer Duane Davis saw Cooper near the alley and Gooch running from the scene. Davis testified that he recognized Gooch, because he had spoken to Gooch in the same alley earlier that day. Later that night, Gooch told Wills that he had shot Cooper. Two days after that, Gooch again spoke to Wills, expressing concern that Cooper had uttered Gooch's name before dying and that the police had found the murder weapon. Gooch also told Abney that he had murdered Cooper and Miller; at trial, Abney offered details from that conversation which corroborated Wills's and Davis's testimony. The gun was found near the crime scene, and law enforcement officials retrieved a fingerprint from the gun that implicated Gooch.

On June 1, 2007, the jury convicted Gooch on a variety of charges, including narcotics conspiracy, RICO conspiracy, burglary, felony murder, first- and second-degree murder, assault, various narcotics and weapons offenses, and the VICAR counts arising from the Cooper/Miller murders. On August 10, 2007, after the jury returned its verdict, Appellant filed a Motion to Vacate the Judgment of Guilt, which was opposed by the Government. *Gooch*, 514 F. Supp. 2d at 64. On September 11, 2007, the District Court issued an order denying Appellant's motion. *Id.* Appellant's motion argued that "'no evidence connected the Cunningham–Lane crimes and the other alleged crimes' other than the commonality of participants," *id.* at 65 (citation omitted), and, therefore, the local and federal claims were misjoined and should have been severed pursuant to Rule 14 of the Federal Rules of Criminal Procedure. *Id.* at 65–66. The District Court rejected these contentions, *id.*, and fully

explained its denial of Appellant's Motion to Vacate the Judgment of Guilt, *id*. at 64–70.

In his appeal before this court, Gooch raises four grounds for reversal:

1) The prosecutors engaged in structural error by using their peremptory challenges to remove well-qualified Blacks from the venire. The Government used the vast majority of its strikes – 16 of 22 – to remove minorities under pretextual reasons. When its proffered reasons for striking many of these African-Americans (not all, to be sure) are examined, its explanations collapse. These discrepancies proved true both for those prospective jurors whom the defense timely challenged, as well as those whom it failed to challenge, which latter group is analyzed under a plain error standard of review.

2) The local and federal charges stemming from the Cunningham-Lane robbery and murders of August 2000 were misjoined under Rule [8], F. R. Crim. P., and D.C. Code, § 11-502(3). This event was not related to M Street: it occurred across town and the Crew didn't engage in crimes-for-hire. The fact that two of Gooch's friends helped did not transform this isolated episode into an act in furtherance of the charged conspiracies. Inclusion of these charges, which were the focus of the last seven days of the Government's case, exposed the jury to extraneous evidence of violence that bore no relationship to the core federal offenses. That exerted a powerful subliminal effect on the jury's ability to compartmentalize the evidence.

3) The district judge's failure to sever the Cunningham-Lane charges [under Rule 14, F. R. Crim. P.] was an abuse of discretion. These charges were not part of a common scheme or plan. Their retention prejudiced Gooch's defense for the same reasons as the misjoinder claim.

4)  The trial court erred in failing to grant Gooch's motion made at the conclusion of the Government's case in chief for acquittal of the VICAR charges for the murders of Ms. Miller and Mr. Cooper.  There was no evidence that he shot them to gain entrance to the Crew or maintain a reputation or to retaliate against the victims.

Appellant's Br. at 8–9.  We deal with each of these claims in turn in the following Analysis.

## II. ANALYSIS

### A.  Standard of Review

*Batson* **challenges**.  In the District Court, Gooch asserted *Batson* challenges to the Government's strikes of several jurors. The Government then offered an explanation for each of its strikes.  Gooch unsuccessfully challenged the Government's explanations for the peremptory strikes of Jurors 408, 854, and 1940.  On appeal, he presses his challenges to the Government's peremptory strikes of Jurors 408 and 854, but no longer challenges the strike of Juror 1940.  We review the District Court's denial of Gooch's preserved *Batson* challenges of the Government's peremptory strikes of Jurors 408 and 854 under the clearly erroneous standard.  *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." (citations omitted)).

For the first time on appeal, Gooch asserts that, with respect to the views of Jurors 408, 854, 449, 1891, 3126, and 3400, the prosecutor failed to strike similarly situated white venire members.  Appellant also challenges for the first time on appeal the Government's explanations for striking Jurors 449, 1891, 2556, 2713, 3126, 3172, and 3400.  Because he did not raise and preserve these objections before the District Court, we review only for plain error.  *See United States v. Moore*, 651 F.3d 30, 43 (D.C. Cir. 2011) (per curiam) (holding that where "the defense

did not object to the prosecution's strike of . . . prospective jurors[, t]he district court's rulings on the[] strikes are . . . reviewed only for plain error" (citing *United States v. Charlton*, 600 F.3d 43, 50 (1st Cir. 2010)).

**Joinder**. We review the joinder of the counts arising from the Cunningham/Lane murders *de novo*. *See United States v. Halliman*, 923 F.2d 873, 882 (D.C. Cir. 1991). Joinder under Rule 8 "governs only the initial joinder of counts and defendants: the only issue under Rule 8 is whether joinder was proper at the beginning of trial. The propriety of joinder is determined as a legal matter by evaluating only the indictment [and] any other pretrial evidence offered by the Government." *United States v. Carson*, 455 F.3d 336, 372 (D.C. Cir. 2006) (per curiam) (alteration in original) (citations omitted) (internal quotation marks omitted). "The government need only allege the facts necessary to sustain joinder, not prove them." *Id*. at 372 n.32 (citations omitted) (internal quotation marks omitted).

Rule 8 includes two parts, and it states:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged – whether felonies or misdemeanors or both – are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

FED. R. CRIM. P. 8. "The major distinction between subdivisions (a) and (b) lies in their treatment of offenses 'of the same or

similar character.'  As long as only one defendant is concerned, Rule 8(a) permits joinder of such offenses, even if they are entirely unrelated to each other.  On the other hand, in the multiple defendant context, Rule 8(b) forbids joinder, even of identical crimes, unless those crimes are part of 'the same series of acts or transactions.'" *United States v. Jackson*, 562 F.2d 789, 796 (D.C. Cir. 1977); *see also United States  v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984).

The parties have mistakenly suggested that Rule 8(b) governs here, summarily citing our case law holding that Rule 8(b), not Rule 8(a), applies where both multiple offenses and multiple defendants are involved.  *See* Appellant's Br. at 65 (citing *United States v. Nicely*, 922 F.2d 850, 853–55 (D.C. Cir. 1991)); Appellee's Br. at 57 (citing *United States v. Brown*, 16 F.3d 423, 425 (D.C. Cir. 1994)).  These cases are inapposite, however, because they involve situations in which co-defendants were tried together.  A defendant's Rule 8(b) claim is effectively mooted when, as here, the co-defendants all plead guilty or are otherwise dropped from the case before trial.  *See, e.g.*, *United States v. Treadwell*, 566 F. Supp. 80, 86 (D.D.C. 1983) ("Rule 8(b) applies to cases involving multiple defendants and offenses. In that defendant Treadwell is the only defendant yet facing charges in the instant case, Rule 8(b) is inapplicable."). Appellant's claim of misjoinder of defendants was effectively resolved when his co-defendants pled guilty before the trial.  The only issue before the court, therefore, is whether the joinder of offenses was proper.  That is an issue that is analyzed under Rule 8(a).

"Rule 8 has generally been construed liberally in favor of joinder." *United States v. Richardson*, 161 F.3d 728, 733 (D.C. Cir. 1998).  And a misjoinder under Rule 8 is subject to the harmless error rule.  *See United States v. Lane*, 474 U.S. 438, 449 & n.12 (1986) (discussing Rule 8(b)).  "However, joinder under Rule 8 is not infinitely malleable:  it cannot be stretched to

cover offenses . . . which are discrete and dissimilar and which do not constitute parts of a common scheme or plan." *Richardson*, 161 F.3d at 733. Moreover, the District Court lacks jurisdiction altogether over D.C. Code offenses if they are not properly joined with federal offenses. *See id*. at 733–34.

**Severance**. We review the District Court's denial of Gooch's motion to sever under Rule 14 of the Federal Rules of Criminal Procedure for an abuse of discretion. *See Carson*, 455 F.3d at 373 (noting that "the grant of relief under Rule 14 lies within the discretion of the trial judge and refusal to sever counts . . . properly joined under Rule 8 will be reversed only if discretion was abused" (alteration in original) (citations omitted)). Rule 14 provides that "[i]f the joinder of offenses . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). The defendant carries the burden of demonstrating prejudice resulting from a failure to sever, *Carson*, 455 F.3d at 374, but such a showing does not result in an automatic grant of the motion, *see Lane*, 474 U.S. at 450 n.12 ("The first hurdle in obtaining a severance under Rule 14 is a showing of prejudice, and if shown, it remains in the district court's discretion whether to grant the motion."). Severance is proper "only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (discussing Rule 8(b)).

**Motion for Acquittal**. Finally, we review the denial of Gooch's motion for acquittal of his VICAR convictions *de novo*. *See United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001). The court must determine whether the evidence, considered in the light most favorable to the Government, is "sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *Id.* (citations omitted).

**B. Appellant's *Batson* Challenges**

A *Batson* challenge is premised on the principle that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson*, 476 U.S. at 86. Race-based exclusion also harms the community at large by undermining confidence in the judicial system, *id.* at 87, as well as the jurors themselves by precluding their participation in the administration of justice, thereby "foreclos[ing] a significant opportunity to participate in civic life," *Powers v. Ohio*, 499 U.S. 400, 409 (1991).

The pursuit of a *Batson* challenge typically proceeds in three steps. First, the defendant must make a prima facie showing that a peremptory challenge was exercised on the basis of race. *Snyder*, 552 U.S. at 476. Second, if that showing is made, the prosecution must respond with a race-neutral basis for the strike. *Id.* at 476–77. Third, the trial court must determine whether the defendant has shown purposeful discrimination. *Id.* at 477. Once the prosecution has offered a race-neutral explanation and the trial court has ruled, the issue of the prima facie showing becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion).

The Supreme Court has made it clear that appellate review of the trial court's findings is limited.

> On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness,

inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to [the trial court].

*Snyder*, 552 U.S. at 477 (alterations in original) (citations omitted) (internal quotation marks omitted).

There are no exceptional circumstances requiring reversal here. Appellant argues that the prosecution engaged in a pattern of race-based peremptory challenges, Appellant's Br. at 10, and that the District Court's finding to the contrary was clearly erroneous. Appellant points out that "the aggregate discrepancies in [the prosecution's] strikes of Blacks compared with Caucasians suggest that *something* was skewed. The 64-member jury pool was divided equally on racial lines. Yet the Government used 16 of its 22 strikes (73%[]) against African-Americans and other minorities and 6 against Caucasians." *Id.* at 15 (footnote omitted). It is true, as Appellant points out, that "[d]iscriminatory purpose may be inferred from a disproportionate 'challenge rate,' when a party exercises a disproportionate share of its total peremptory strikes against members of a cognizable racial group compared to the percentage of that racial group in the venire." *Id.* at 15 n.28 (citations omitted). But a *Batson* analysis requires consideration of "all of the circumstances that bear upon the issue of racial animosity," *Snyder*, 552 U.S. at 478 (citation omitted), and the statistics offered by Appellant do not paint a complete picture.

While the ratio of black jurors stricken by the prosecution to total jurors stricken by the prosecution (16:22) is conspicuous,

the ratio of stricken black jurors to total potential black jurors in the venire (16:32 or 16:37) is not as dramatic. And of the eighteen sitting and alternate jurors ultimately selected from a jury pool that divided equally along racial lines, eight were white, eight were black, one was Asian, and one was Latino. Appellee's Br. at 19. When the "jury composition mirror[s] the make-up of the venire" and "the prosecutor's strikes [do] not skew the racial composition of the resulting jury," "[t]he circumstances . . . are a far cry from the facts of cases in which the Supreme Court has found a *Batson* violation." *Moore*, 651 F.3d at 41 (citations omitted).

Appellant relies heavily on the Court's decisions in *Miller-El v. Dretke*, 545 U.S. 231 (2005), and *Snyder v. Louisiana* in support of his claim that the Government engaged in a pattern of race-based peremptory challenges. *Miller-El* and *Snyder* are tellingly different from this case, however. In *Miller-El*, for example, the Court relied in part on the "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries." 545 U.S. at 253. And, as the Government notes:

> In *Miller-El*, a capital murder case, the prosecutors used their peremptory strikes to exclude [more than 90] percent of the eligible black venire members, misrepresented some . . . [juror] statements, and failed to strike similarly situated white venire members. 545 U.S. at 241–252. Furthermore, the evidence of racial discrimination went "beyond these comparisons to include broader patterns of practice during the jury selection," including "[t]he prosecution's shuffling of the venire panel" when a predominant number of black jurors were seated in the front of the panel. *Id*. at 253–254. The prosecution also engaged in disparate questioning of black jurors about their views on the death penalty and minimum acceptable sentences in an effort to solicit responses that would justify a strike. *Id*. at 255–263.

Appellee's Br. at 24–25 (fourth alteration in original) (footnote omitted).

In *Snyder*, "[e]ighty-five prospective jurors were questioned as members of a panel. Thirty-six of these survived challenges for cause; 5 of the 36 were black . . . ; and all 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes." 552 U.S. at 475–76. The Court also rejected as incredible the prosecution's strike of a black juror because the prosecution believed the juror might be inclined to find the defendant guilty of a lesser offense so that he could avoid the penalty phase of trial and thereby minimize the amount of school work that he would miss due to jury service. *Id.* at 482. The Court held that "[t]he implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as [the black juror's]." *Id.* at 483.

In viewing the record as a whole, we find that Appellant has failed to support his claim that the Government engaged in a "pattern" of race-based peremptory challenges. However, although the circumstances of this case do not indicate that the prosecution used its peremptory strikes to discriminate on the basis of race, "those facts alone are not dispositive. The dismissal of even a single prospective juror on the basis of race violates equal protection principles." *Moore*, 651 F.3d at 42 (citing *Snyder*, 552 U.S. at 478). We therefore must review the District Court's denial of Appellant's *Batson* challenges to Jurors 408 and 854. These challenges were properly raised before the trial court and preserved for appeal, so our review is pursuant to the clearly erroneous standard.

### 1. Appellant's Preserved Challenges

**Juror 408**: The Government offered two race-neutral reasons for its strike of Juror 408, a black female:

(1) she "ha[d] some opposition to the death penalty," and (2)

based on her work as a youth minister, her experience counseling drug addicts, and her work conducting mediation in Superior Court, the government believed she would show "sympathy towards the idea of rehabilitation and sympathy towards people that use crack, wanting to be able to sort of reconcile and forgive."

Appellee's Br. at 28 (alteration in original) (citation omitted).

Before the District Court, Appellant contended that the Government had no legitimate grounds upon which to justify its peremptory strike of Juror 408. Tr. 2/5/07 at 1028. The District Court rejected Appellant's challenge. The trial judge found that Juror 408 "indicated significant hesitation which [was] really against the death penalty." *Id.* The judge also found that "the fact that [Juror 408] spends her ministry with troubled youth in this city where troubled youth are often a synonym for poverty, drugs and guns and that's her calling," suggested that "she might be more sympathetic to the defendant than the government would prefer." *Id.* The judge thus concluded "that is not a race base[d] but rather race neutral response to what she does with her energies and her time and her devotion." *Id.* The District Court's findings are supported by the record and not clearly erroneous.

**Juror 854**: We also hold that the District Court's determination rejecting Appellant's challenge to the Government's peremptory strike of Juror 854 was not clearly erroneous. This juror, a black female, wrote on her questionnaire that law enforcement agencies "should be more committed to the cause and not think they are above the law[.] [M]ost cops are good. [A]ll are not." Juror Questionnaires, App. to Appellant's Br., Vol. IIA at 183. She also wrote that "[r]acial profiling happens and clouds people['s] judgment." *Id.* at 184. When asked by the trial court judge to elaborate, Juror 854 said:

I have been pulled over a couple of times, something like

that. I have brothers in, you're a black man you're driving you're going to get pulled over, you know. And having to tell my nephews these are the procedures when you get pulled over because you never know who is going to do what. And you never know if you are going to have a good cop or a cop that's having a bad day, you know. And they are armed, you know. So you have to be careful.

Voir Dire Tr., Jan. 24, 2007 ("1/24/07"), App. IIB at 917.

The Government's reasons for striking Juror 854 and Appellant's challenge are concisely summarized in Appellee's brief:

> The government explained that it struck Juror 854 because she "laughed many times during the course of the conversations with the court," and appeared to "try[] to ingratiate herself with the court." Furthermore, based on the juror's statement that "she had to tell her nephew the procedures for when he got pulled over by the police," the government believed that Juror 854 might "espouse the view of the driving while black theory." "[T]hat coupled with the way that she responded to the court's questions coupled with her age" led the government to conclude that Juror 854 "would not be sympathetic to the government's position."
>
> Appellant challenged the government's reasons, asserting that Juror 854 never mentioned "driving while black," and that, even if she did, that was not a race-neutral reason to strike her. Appellant argued that neither that nor the juror's laughter during voir dire was a "particularly good reason[] to strike anybody."

Appellee's Br. at 32 (alterations in original) (citations omitted).

The trial judge accepted the Government's reasons for striking Juror 854. The judge explained that she "remembere[d] very well" the juror's laughs, which "probably don't show up on

the transcript anywhere, but were at the wrong times." Tr. 2/5/07 at 1029. The judge also construed the juror's discussion of being pulled over "as a statement about whether or not that juror would be inclined to credit police officers or would automatically not." *Id.*

The District Court's determination regarding Juror 854 is not clearly erroneous. The Government could have reasonably viewed inappropriate laughter as indicating a higher risk that Juror 854 would not be a serious trier of fact. Deference to the District Court's finding on this point is "especially appropriate," because the "trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder*, 552 U.S. at 479. Furthermore, the Government could have perceived the juror's statements regarding police as another valid reason to strike. The Government's strike cannot be seen to have been discriminatory, merely because the Juror referenced race in expressing concerns about blacks' being pulled over by the police. We have no good reason to disagree with the District Court's finding that the Government may have been reasonably concerned about the Juror's apparent distrust of the police.

### 2. Appellant's Unpreserved "Similarly Situated" Challenges

Appellant contends for the first time on appeal that the views of Jurors 408, 854, 449, 1891, 3126, and 3400 resemble those expressed by several seated whites, signaling that something was amiss. These challenges lack merit.

In *Snyder*, the Court noted that, in cases in which a defendant's *Batson* challenges rest on comparative-analysis ("similarly situated") claims,

> a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In th[ese] situation[s], an appellate court must be mindful that an exploration of the

alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.

552 U.S. at 483. In *Snyder*, however, the Court allowed a retrospective comparison of jurors, because "the shared characteristic [of the jurors], *i.e*., concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause." *Id*. There was only one alleged shared characteristic at issue in *Snyder* – jurors' concerns over having to commit to jury duty in the face of conflicting obligations. It was easy for the Court to sort out this one shared characteristic even on a cold appellate record. The same is not true here.

Appellant argues that the views of a number of black jurors – on issues such as the death penalty, rehabilitation, and trust of police officers – resemble the views expressed by several seated white jurors. The array of issues and comparisons would make a retrospective comparison of jurors based on a cold appellate record farcical. The record in this case does not, as in *Snyder*, allow for easy comparisons of jurors' views. For example, the jurors' views on the death penalty covered a wide spectrum, and several jurors wavered on that topic during questioning.

Appellant does not contend that his "similarly situated" arguments were in any way explored by the District Court. This is not surprising, because the similarly situated challenges were abandoned by Appellant in the District Court. In other words, this is not a case in which counsel inadvertently overlooked a possible objection. Counsel for Gooch affirmatively requested leave to raise similarly situated objections, indicating that he would like time to perform a comparative analysis of stricken black jurors with those jurors who remained in the jury pool and that he would do so that night. The trial judge granted counsel's request, but asked him to be prompt in submitting any objections. Gooch's counsel, however, never raised the matter again, so the issue was effectively dropped and never pursued before the

District Court.

The situation here does not come close to resembling the situation faced by the Court in *Snyder*. Rather, this is a case in which "a retrospective comparison of jurors based on a cold appellate record" would be "very misleading," because "an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Snyder*, 552 U.S. at 483. In these circumstances, our inclination might be to hold that "a 'similarly situated' argument is untimely and cannot be made if it is raised for the first time on appeal rather than at the trial level." *United States v. Gibson*, 105 F.3d 1229, 1232 (8th Cir. 1997) (citation omitted). The issue is a bit more complicated than this, however, so we must amplify.

In *United States v. Moore*, the court made it clear that the appellate court should be loath to overturn trial court determinations regarding *Batson* challenges in instances in which "'[a]ppellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision.'" 651 F.3d at 42 (alteration in original) (quoting *Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring)) (citing *Snyder*, 552 U.S. at 483). *Moore* indicates that this is especially inappropriate in situations in which the court is asked to assess the demeanor of seated jurors. *See id.* We think that it is also inappropriate in situations in which the defense seeks for the first time on appeal to pursue challenges based on retrospective comparisons of jurors based on alleged "shared characteristics." When the challenges are not properly raised with the District Court, the appellate court loses the benefit of the trial judge's assessments of the prosecutor and prospective jurors. *See Snyder*, 552 U.S. at 477.

We recognize that in *Moore*, the defense did not object in the District Court to the Government's strike of several prospective jurors, and this court nevertheless reviewed the

challenges on appeal pursuant to the plain error standard. *See* 651 F.3d at 43–44. In applying the plain error standard, the *Moore* court referenced *United States v. Charlton*, in which the First Circuit held:

> "We . . . apply plain error review to unpreserved *Batson* claims. . . ." In applying this standard of review, we have observed a Supreme Court ruling that, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

600 F.3d at 50 (alterations in original) (citations omitted). The court in *Charlton* did not explicitly explain what it meant by "inherent"; however, in the context of unpreserved *Batson* challenges, we take it to mean "manifest," "patent," or "unmistakable."

Pursuant to plain error review, an appellant must demonstrate (1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732–37 (1993). In *United States v. Brown*, 352 F.3d 654 (2d Cir. 2003), the Second Circuit, adhering closely to the Supreme Court's definition of plain error in *United States v. Olano*, ruled that, "[i]n the *Batson* context," when strikes are evaluated for plain error,

> it is normally the case that the only complicated question is whether the second prong [of *Olano*] is satisfied – that is, whether the error at issue is "plain." For if we decide that the district court's approval of a challenge based on [race] is error under the first prong, the third and fourth prongs of the *Olano* test are also generally met.

*Brown*, 352 F.3d at 664. The *Brown* decision holds that error is plain if it is "so egregious and obvious as to make the trial judge

and prosecutor derelict in permitting it, despite the defendant's failure to object." *Id*. at 664–65 (citations omitted) (internal quotation marks omitted).

In the context of unpreserved *Batson* claims, we agree with the *Charlton* and *Brown* conceptions of the plain error standard. Under *Olano*, "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" 507 U.S. at 734 (citations omitted). If a defendant cannot carry the burden of showing that discriminatory intent was manifest in the Government's use of a peremptory strike, we cannot imagine how the alleged error can be "plain" as required by *Olano*. It seems axiomatic, then, that in a case like this, in which the Government offers race-neutral reasons to justify peremptory strikes, the District Court credits the Government's submissions, the defendant fails to object, and then, on appeal, the defendant fails to show that the Government's actions were manifestly discriminatory, there is no plain error. In these circumstances, the appellate court has no basis upon which to second-guess the trial judge's determinations.

In this case, in raising "similarly situated" arguments for the first time on appeal, Appellant points to nothing in the record to indicate that discriminatory intent was manifest in the Government's peremptory strikes of the cited jurors. We therefore find no plain error.

### 3. Appellant's Other Unpreserved *Batson* Challenges

As noted above, Appellant for the first time on appeal also challenges the Government's explanations for striking Jurors 449, 1891, 2556, 2713, 3126, 3172, and 3400. Our bottom-line judgment is simple: Appellant points to nothing in the record to indicate that discriminatory intent was inherent in the Government's strikes of these Jurors. Nor does Appellant point to any peremptory strike that was so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite Appellant's failure to object. We therefore find no plain

error.

**Juror 449**: The Government struck Juror 449, a black female, because "[s]he said that she did not believe that the death penalty was the right choice" and "voiced moral opposition" to the penalty. Tr. 2/5/07 at 1024. The Government's explanation might have been imprecise – the juror did dispute whether she had a "moral opposition to the death penalty," Voir Dire Tr., Jan. 22, 2007 ("1/22/07") at 869 – but it was not wholly incorrect. Juror 449 often expressed opposition to the death penalty, explaining during voir dire that she was "not really for the death penalty," that "[k]illing someone isn't justification because they did it to someone else," *id.* at 861, that there were no crimes for which she could vote to impose death, *id.*, and that the number of murders would not make a difference, *id.* at 862.

**Juror 1891**: The Government, referencing the questionnaire of Juror 1891, a black female, explained that she had written that "punishment for life would have more of an impact than the death penalty[,] [a]nd so [the Government] took her at her word that she really could not give meaningful consideration to the death penalty" despite the fact that, in response to the trial judge's questions, she qualified her apparent rejection of the death penalty. Tr. 2/5/07 at 1027. While this is technically incorrect – Juror 1891 explained in her questionnaire that she was merely "unsure" about whether she could meaningfully consider the penalty in some instances, Juror Questionnaires at 352–53 – she did indicate in her questionnaire that she was "somewhat opposed to the death penalty," *id.* at 351. She also consistently indicated, in both her questionnaire and at voir dire, a preference for life imprisonment. *See id.* at 352, 353; Voir Dire Tr., Jan. 25, 2007 at 979.

**Juror 2556**: Juror 2556, a black male, stated that he "honestly" thought the death penalty would be "too harsh," Voir Dire Tr., Jan. 19, 2007 at 836, that his experience being handcuffed left him with a "bad impression that . . . [the police]

falsely accused me," *id.* at 832, and that he would be inclined to believe a defendant who took the stand and claimed innocence, *id.* at 829. These statements support the Government's three reasons for striking him: He said that the death penalty was too harsh; he indicated that he really could not believe the police; and he stated that he would consider a testifying defendant to be innocent. Tr. 2/5/07 at 1024.

**Juror 2713**: Both parties struck Juror 2713, and Appellant agreed to "skip" the explanation for this strike. *See id.* at 1026–27. By "acquiesc[ing] in a ruling," Appellant waived his argument as to this strike. *United States v. Rogers*, 918 F.2d 207, 212 (D.C. Cir. 1990) (citations omitted).

**Juror 3126**: Juror 3126, a black female, indicated serious reservations about the death penalty, stating at voir dire that she did not "like it" or "believe in it." Voir Dire Tr., 1/24/07 at 929. When asked if the penalty could ever be warranted, she replied that she might consider it if a family member were murdered. *Id.* However, she also said that while she did "not support the death penalty 100%" she "would consider it," Juror Questionnaires at 664, and could give it meaningful consideration and vote for it, Voir Dire Tr., 1/24/07 at 933. Accepting the Government's reasons to strike – that it was concerned about, first, the fact that she did not believe in the penalty and did not "support it a hundred percent," and, second, the fact that her family member was not a victim in the case, Tr. 2/5/07 at 1026 – was not plain error.

**Juror 3172**: Juror 3172, a black male, worked in mental health and drug rehabilitation. Juror Questionnaires at 697; Voir Dire Tr., 1/22/07 at 886–87. His sister was addicted to crack, and he was in the process of adopting her child. Voir Dire Tr., 1/22/07 at 877. However, he maintained that he could be impartial as to drug allegations. *Id.* at 877, 888. He also indicated on his questionnaire that his roommate had been shot. Juror Questionnaires at 696. However, during questioning, he

stated that he did *not* have any family or friends who had been the victim of a gunshot. Voir Dire Tr., 1/22/07 at 878. He then said he had "forgot[ten] all about" the incident with his roommate, before going on to explain that his roommate had died from the gunshot wound. *Id.* at 888. The Government gave two race-neutral reasons for the strike: The juror might be sympathetic to drug users; and his apparent failure to remember a roommate being shot to death suggested there was "something not right about that juror." Tr. 2/5/07 at 1025. Certainly both considerations were relevant, race-neutral reasons to strike.

**Juror 3400**: The Government struck Juror 3400, a black female, because she had "served on a previous jury and found the person not guilty," and because she demonstrated a moral opposition to the death penalty, as shown by the fact that she indicated that she could uphold the death penalty only after repeated questioning by the court. *Id.* at 1026. Actually, Juror 3400 stated that she had served on a jury in which no verdict was reached. Juror Questionnaires at 752. This mistake is hardly suspicious. And the juror did indicate that she was "disappointed or dissatisfied with our criminal justice system" as a result of this prior jury experience, in which the prosecution had failed to produce "enough evidence." *Id.*; *see also* Voir Dire Tr., 1/24/07 at 809–10. At voir dire, the juror initially indicated hesitation about the death penalty. Voir Dire Tr., 1/24/07 at 813–14. After further questioning, however, she changed course to state that she could vote for the penalty. *Id.* at 814. The Government obviously was wary of the juror's inconsistent positions on the death penalty. This is a moot point, however, because the Government's first reason for striking the juror – her dissatisfaction with the criminal justice system – was enough to sustain its strike without running afoul of *Batson*.

In sum, we reject Appellant's unpreserved *Batson* challenges. As noted above, if the Government offers race-neutral reasons for a peremptory strike, and the defendant cannot carry the burden of showing that discriminatory intent was inherent in the

Government's action, the alleged error cannot be "plain" under *Olano*. Nothing in the record indicates that discriminatory intent was inherent in the Government's peremptory strikes of Jurors 449, 1891, 2556, 2713, 3126, 3172, or 3400.

## C. Joinder

As we have already explained, joinder is an ex ante, pre-trial consideration governed by Federal Rule of Criminal Procedure 8. *See Carson*, 455 F.3d at 372–73. Rule 8(a) provides that there may be a "joinder of offenses" if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). The District Court has jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." D.C. CODE § 11-502(3) (2001). "Joined" in this context means "properly joined" under Rule 8. *Carson*, 455 F.3d at 373 n.33 (citations omitted) (internal quotation marks omitted).

Joinder analysis does *not* take into account the evidence presented at trial. *See Moore*, 651 F.3d at 69 ("[T]rial evidence cannot render joinder [under Rule 8(b)] impermissible and is thus irrelevant to our inquiry." (citations omitted)); *Carson*, 455 F.3d at 372. Instead, a court applying Rule 8 focuses solely on the indictment and pre-trial submissions. And the Government need merely allege, not prove, the facts necessary to sustain joinder. *Carson*, 455 F.3d at 372 n.32. Therefore, in this case, the Government needed only to allege facts showing that the acts or transactions described in Rule 8(a) "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a).

Our *de novo* review of the indictment and pre-trial submissions convinces us that joinder was appropriate. The indictment charged Gooch with narcotics and RICO conspiracies,

Superseding Indictment at 10–42, as well as the Cunningham/Lane burglary, robbery, and murders, as separate acts, *id.* at 57–63, and as overt acts in furtherance of both conspiracies, *id.* at 14–15, 40. With respect to the RICO conspiracy, the indictment also alleged that "[a] principal goal of the organization was to obtain money and other things of value" and that "[i]t was a further goal . . . to traffic in controlled substances, . . . [and] to commit acts of murder, . . . robbery, [and] burglary, . . . [in order] to enrich the enterprise and its members . . . and to promote and enhance the reputation and standing of the enterprise and its members." *Id.* at 38.

The Government's pre-trial representations additionally explained that the Cunningham/Lane incident arose "in conjunction with a plan to steal money and drugs" from the victims and that the robbery and murders were "done by members of the enterprise, to enrich the enterprise and each defendant's position in the enterprise was both benefitted by and enhanced by his participation in the robbery and the execution style killing." Gov't's Supplemental Mem., App. for Appellee at 6. Where an indictment alleges that the defendant and others participated in a conspiracy "with the shared goal of 'enriching themselves,'" and pre-trial submissions allege a common scheme, joinder is proper under Rule 8(a). *Cf. United States v. Spriggs*, 102 F.3d 1245, 1255–56 (D.C. Cir. 1996) (per curiam) (holding that "joinder [under Rule 8(b)] is appropriate if there is a logical relationship between the acts or transactions so that a joint trial produces a benefit to the court" (citations omitted) (internal quotation marks omitted)). In addition, as noted above, Rule 8(a) permits the joinder of offenses of the same or similar character, "even if they are entirely unrelated to each other." *Jackson*, 562 F.2d at 796.

Taken together, the indictment and the pre-trial representations alleged that the Cunningham/Lane murders were in furtherance of the conspiracies and that participation in the conspiracy enriched the enterprise's members. These pre-trial submissions were sufficient to justify the joinder of the local and

federal charges at issue in this case.

## D. Severance

Although we have found no error in the pre-trial joinder of the local and federal counts against Appellant, we still must consider whether the District Court later erred in denying Appellant's motion under Rule 14 of the Federal Rules of Criminal Procedure to sever the counts. Rule 14 states that if "joinder . . . appears to prejudice a defendant . . . the court may order separate trials of counts . . . or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). The discussion in *Carson* explains the interplay between Rule 8 and Rule 14:

> After counts are joined, subsequent severance [is] controlled by Rule 14. Whereas misjoinder under Rule 8 is determined according to the propriety of joining offenses before trial, severance may be warranted under Rule 14 at all stages of trial because the district court has a continuing duty to sever counts if it finds a risk of prejudice. That Rule 8 and Rule 14 operate differently is made clear by the standards governing appellate review of a district court's decision under them. Judge Friendly explained:
>
>> The question[s] of the propriety of joinder under Rule 8 and of refusal to grant relief from prejudicial joinder under Rule 14 are quite different in nature . . . . The former is a question of law, subject to full appellate review . . . . In contrast, the grant of relief under Rule 14 lies within the discretion of the trial judge and refusal to sever counts . . . properly joined under Rule 8 will be reversed only if discretion was abused . . . .

455 F.3d at 372–73 (alterations in original) (citations omitted) (internal quotation marks omitted).

The defendant carries the burden of demonstrating prejudice resulting from a failure to sever. *Id*. at 374. Severance is proper, however, "only if there is a serious risk that a joint trial would . . .

prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

We have noted that, in assessing motions to sever under Rule 14 when there has been no misjoinder under Rule 8(a),

> [t]hree kinds of prejudice warrant relief under Rule 14: 1) the jury may cumulate evidence of the separate crimes; 2) the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt; 3) the defendant may become "embarrassed or confounded" in presenting different defenses to the different charges.

*Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968) (citation omitted). On the record before us, Appellant has failed to demonstrate any such prejudice resulting from the joinder of the local and federal charges. Therefore, the District Court did not abuse its discretion under Rule 14.

There are several considerations that influence our judgment. First, in a case involving joinder under Rule 8(b), the Supreme Court has cautioned that if "the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of . . . prejudice." *Schaffer v. United States*, 362 U.S. 511, 516 (1960). The same concern applies with respect to joinder under Rule 8(a). In this case, however, the concern is of little moment, because the evidence against Appellant was compelling on the charges at issue.

Second, the trial court gave limiting instructions at both the start and close of trial. At the beginning of trial, the court explained that the jury was not to infer guilt from the fact of the indictment, the number of charges alleged, or the type of charges brought. At the end of trial, the jury was instructed that its finding as to one offense "should not control [its] verdict as to any other offense charged, except as [otherwise instructed]," Excerpt Instructions, App. IB at 290, and that it must not allow the

"character of any charge itself to [a]ffect" arrival at a verdict, Trial Tr., May 3 a.m., 2007 at 16. The court also cautioned the jury that "[e]ach offense and the evidence pertaining to it should be considered and decided separately" and that the "indictment is not evidence." *Id.* Such limiting instructions are sufficient to address prejudice. *See, e.g.*, *Zafiro*, 506 U.S. at 540–41; *Carson*, 455 F.3d at 374–75; *Spriggs*, 102 F.3d at 1256. Furthermore, we may presume that the jury followed those instructions. *Brown*, 16 F.3d at 430. It is also noteworthy that the jury acquitted Gooch of the VICAR counts based on the Cunningham/Lane murders and of another murder and its related charges. Verdict Findings, App. IB at 298, 300–01. This outcome affords "some evidence that the jury did follow the instructions and was able to discriminate among charges and evidence." *Brown*, 16 F.3d at 430.

Third, Appellant asserts that the Government presented the offenses related to the Cunningham/Lane incident last in trial, even though they occurred first in real time. This, says Appellant, was highly prejudicial. Chronological presentation may be relevant to the issue of prejudice, *see Spriggs*, 102 F.3d at 1256, but it is hardly dispositive. Indeed, in this case, the presentation of the Cunningham/Lane murders last may have helped to avoid prejudice by keeping these murder charges separate and discrete from other charges.

Finally, Appellant argues that the Cunningham/Lane evidence would not have been admissible at a separate trial. Even assuming, *arguendo*, that he is correct – and we need not decide this – there is "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." *Drew v. United States*, 331 F.2d 85, 91 (D.C. Cir. 1964) (citations omitted); *see also Jackson*, 562 F.2d at 794 ("[Joinder of offenses under] Rule 8(b) is not limited to situations in which proof of the other criminal transaction would be admissible in a separate trial." (alteration in original) (citation omitted)). The offenses arising

from the Cunningham/Lane incident were relatively "simple and distinct," so it does not matter whether the evidence would have been admissible in a separate trial.

In sum, even where "the counts [are] misjoined, or the severance motion improperly denied, the district court's rulings must be upheld" where an appellant fails to "demonstrate[] any prejudice resulting from them." *Spriggs*, 102 F.3d at 1256 (citations omitted). We may affirm, "even if the circumstances are such that a grant of severance would have been sustainable, particularly since potential prejudice to a defendant may be obviated by jury instructions." *Carson*, 455 F.3d at 374 (citations omitted) (internal quotation marks omitted); *Zafiro*, 506 U.S. at 539 ("When the risk of prejudice is high, . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." (citation omitted)). The presentation of the evidence, the content of the jury instructions, and acquittal on some charges all indicate that prejudice was obviated here, such that the jury was not prevented from making a reliable judgment about guilt or innocence. *See Carson*, 455 F.3d at 374.

## E. VICAR Murders

The VICAR statute criminalizes murder related to racketeering activity committed by a defendant

> with one of three motives: (1) as consideration for . . . anything of pecuniary value from such an enterprise, (2) as consideration for a promise . . . to pay something of value from such an enterprise, or (3) for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.

*Carson*, 455 F.3d at 369 (alternations in original) (quoting 18 U.S.C. § 1959(a)) (internal quotations marks omitted). Whether Gooch acted with the third motive is at issue here.

The motive of maintaining or increasing one's position in an enterprise may be reasonably inferred where the defendant

commits the crime "in furtherance of" enterprise membership or where the defendant "knew it was expected of him by reason of his membership in the enterprise." *Carson*, 455 F.3d at 369 (citations omitted). Such a motive has been found where the defendant murdered individuals on suspicion that they were cooperating with police and thereby jeopardizing the enterprise, *see United States v. Dhinsa*, 243 F.3d 635, 672 (2d Cir. 2001), or murdered individuals to "maintain or increase his own reputation as an enforcer in the enterprise," where the defendant "frequently carried out violent crimes against those who threatened the organization," *Carson*, 455 F.3d at 370.

A jury could determine beyond a reasonable doubt that the murders charged to Gooch were committed in furtherance of his gang membership. The jury heard that there were rumors that Cooper and Miller stole drug stashes; and the jury heard that Miller had admitted doing so herself. There was also testimony that Miller and Cooper were snitches. Stealing and snitching clearly posed a threat to the gang. And the jury heard testimony that a response to such threats would be violent. One witness explained that someone who stole drug stashes ran the risk of being shot. Another witness described the gang's reputation simply as "f**k with one you f**k with all, it's over." Trial Tr., Mar. 29 a.m., 2007 at 35. Indeed, Abney testified that after the Cooper/Miller murders, Gooch stated, "You know I *had* to kill [them]." *See* Trial Tr., 3/27/07 p.m. at 59 (emphasis added). That Gooch would describe the murders as somehow required of him is supported by the social structure of the gang as detailed by evidence at trial – a structure built on the premise that threats to the gang were met with violence. And that violence was often executed by Gooch himself, who was the "muscle" of the M Street Crew. The evidence in this case thus far exceeds that in *United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), the case upon which Gooch most heavily relies. *See id.* at 818–19 (reversing conviction under VICAR statute because jury's finding of intent would have been based upon "pure speculation" and

"guesswork").

Gooch testified that he paid Cooper with crack for fixing his cars. He also testified that he knew about the rumors that Miller stole stashes but did not know whether the rumors were true. He further stated that he knew Miller dealt in the neighborhood, but he had not heard rumors that she had cooperated with police. Considered in the light most favorable to the Government, the jury could have inferred that Gooch knew about the rumors regarding both Cooper and Miller and found those rumors to be sufficient to justify murder in furtherance of the gang's code. The testimony indicated that the rumors were widely discussed and that gang members formed a tight-knit group. Given this evidence, the jury could have discredited Gooch's testimony that he had not heard rumors that both Cooper and Miller were stealing stashes and collaborating with police.

In short, the jury had ample evidence to return a verdict against Gooch. Given that Gooch was well known as a gang enforcer, the jury was free to decide that he was expected to retaliate against those who violated the gang's code. Because the evidence is sufficient to sustain a finding that Gooch committed the murders in order to maintain or improve his reputation within the gang, we reject Appellant's claim that the District Court erred in denying his motion to acquit.

### III. CONCLUSION

For the foregoing reasons, the judgment and rulings of the District Court are affirmed.

*So ordered.*